959 A.2d 278 (2008)
403 N.J. Super. 487
Jeffrey SHECTMAN, Plaintiff-Respondent,
v.
Robert BRANSFIELD, M.D., Defendant-Appellant.
No. A-3035-07T2
Superior Court of New Jersey, Appellate Division.
Argued October 15, 2008.
Decided November 13, 2008.
*279 John M. Walsh, Eatontown, argued the cause for appellant (Amdur, Maggs & Shor, P.C., attorneys; Richard A. Amdur, of counsel and on the brief).
Anthony A. Lenza, Jr., argued the cause for respondent (Amabile & Erman, P.C., attorneys, Staten Island, NY; Mr. Lenza, on the brief).
Before Judges PARKER, YANNOTTI and LeWINN.
The opinion of the court was delivered by
YANNOTTI, J.A.D.
Plaintiff Jeffrey Shectman brought this action against defendant Robert Bransfield, M.D., alleging that defendant deviated from accepted standards of psychiatric care by failing to monitor and supervise his response to certain medications and his deteriorating mental condition, and that defendant's deviations resulted in plaintiff's attempt to commit suicide. The matter was tried to a jury, which returned a verdict for plaintiff awarding $250,000 in damages. Judgment was entered in accordance with the *280 jury's verdict and defendant appeals. For the reasons that follow, we reverse.

I.
When this matter was tried, plaintiff was forty-four years old. He has had a long history of mental illness. He was first treated by a psychiatrist when he was fifteen years of age. He was diagnosed with various mental disorders, including schizoaffective and bipolar disorders; obsessive-compulsive disorder; anxiety and mania. At age sixteen, plaintiff attempted to overdose on medication. Plaintiff testified that this was a "suicidal gesture."
Plaintiff began treatment with defendant in 1991, when he was twenty-seven years old. Initially, plaintiff was treated by defendant and other doctors; however, after about a year or two, defendant became plaintiff's only psychiatrist. Between 1991 and 1999, plaintiff saw defendant twice a year. Defendant prescribed drugs, adjusted the medications, and repeatedly advised plaintiff to quit smoking.
Plaintiff testified that in the summer of 2000, he "was going through some rough times." He said that he was "sort of a little paranoid." He could not sleep well and he was not eating properly. Plaintiff stated that "things just started to churn in a bad way." Plaintiff said that defendant prescribed Paxil and, at the time he was taking that medication, he was very agitated. According to plaintiff, defendant did not instruct him to return to the office on any particular date. Defendant told him to "call up when you need another prescription."
At some point, defendant increased the dosage of Paxil but plaintiff said that his condition worsened. Plaintiff testified that, at the time, he was disheveled. He had not showered, shaved, or changed his clothes in a long time. Plaintiff thought he was Jesus or Gandhi. He believed that he "could change people." Plaintiff asserted that there were times when he could not sleep for weeks.
Plaintiff recalled going to see defendant on October 9, 2000. Defendant instructed him to stop taking Paxil and he gave plaintiff samples of another medication called Luvox. Plaintiff said that it took a month for him to stop taking the Paxil; it was his understanding that he was supposed "[t]o stop taking it slowly." Plaintiff stated that defendant did not instruct him to return to the office.
Plaintiff testified that, in the days and weeks after the October 9, 2000 visit to defendant, he "was getting worse and worse." He said that he "was really out of sorts[.]" He lost ten pounds in October 2000 and was down to about 145 or 150 pounds. He did not start taking the Luvox. Plaintiff said that he did not "know what was going on at all."
Plaintiff further testified that on November 4, 2000, he had a thought that he was going to hit his sister. He felt hopeless. He took "a bunch of pills" and lost consciousness several times. The following morning, plaintiff swallowed detergent and washed it down with water. He also stabbed himself twenty-seven times, inflicting injuries to his body, wrist and throat. Plaintiff was taken by ambulance to a hospital, where he remained for several weeks.
Plaintiff's mother, Marilyn Bernice Shectman, testified. Mrs. Shectman said that in June 2000, plaintiff was not doing well. She brought plaintiff to see defendant, who prescribed Paxil. Defendant did not schedule a follow-up visit. In September 2000, plaintiff was seen by defendant for an evaluation in order to "continue his [social security] disability[.]" Mrs. Shectman said that plaintiff was doing terribly *281 at the time. He was disheveled and he was not sleeping or eating well.
On October 9, 2000, Mrs. Shectman called defendant's office for an emergency appointment because she was worried. She said that plaintiff "was getting sicker and sicker and not sleeping[.]" She said that plaintiff was "walking and pacing and talking about religious thoughts and [the] paranoia was terrible." She stated that "it was very scary to have him home[.]" Defendant saw plaintiff that day.
Mrs. Shectman recalled plaintiff pacing in the hallway of defendant's office. She said that plaintiff "was really out of it." Defendant told plaintiff to "decrease and discontinue" the Paxil. Defendant prescribed Luvox and gave plaintiff samples of the drug. Defendant did not provide any instruction on when plaintiff was to return to see him.
Mrs. Shectman said that, in the weeks that followed the October 9th visit to defendant's office, plaintiff's condition deteriorated. Plaintiff lost weight. He paced and walked. He could not watch television. He did not listen to music or leave the house. She said that plaintiff was "very, very, very distraught."
On October 27, 2000, Mrs. Shectman called defendant's office. She realized that plaintiff had never started taking the Luvox and he was not on any anti-psychotic medication. Plaintiff did not, however, see the doctor at that time. Mrs. Shectman called defendant's office on November 1st and asked defendant to authorize the refilling of plaintiff's prescription for Haldol.
Mrs. Shectman said that on the evening of November 5, 2000, she was at home with her husband. They were exhausted after having worked a full day. Plaintiff had been home that day with his grandmother, who was then ninety-two years old. Mrs. Shectman said that plaintiff came down to the living room and said hello, but he was "very, very mysteriously quiet[.]"
At around 11 p.m., Mr. and Mrs. Shectman were about to go to sleep when Mrs. Shectman heard a "terrible moaning and groaning" coming from plaintiff's bathroom. She called out to plaintiff, but he told her not to come in. The door to plaintiff's bathroom was locked but Mr. Shectman opened the door using a tool. They found plaintiff in a pool of blood.
Portions of defendant's deposition testimony were read into the record. Defendant stated that he treated plaintiff from 1991 to 2000. He said that plaintiff had been suffering from obsessive compulsive disorder for many years. In 2000, defendant prescribed various medications to address that condition. Plaintiff had been on a drug called Anafranil but had become "overstimulated" by that medication and defendant decided to try Paxil.
In October 2000, plaintiff became increasingly obsessive. Defendant saw plaintiff on October 9, 2000. He explained that plaintiff had not been able to get the dose of Paxil high enough to achieve a strong "anti-obsessive effect[.]" Plaintiff was instructed to reduce the dose of Paxil to ten milligrams for a week, while beginning the Luvox. Plaintiff was then to stop taking Paxil, and remain on Luvox. Defendant gave plaintiff samples of Luvox. Defendant said that he would have provided plaintiff with his customary instruction to return to see him if there was a problem.
Defendant did not see plaintiff after the October 9, 2000 visit. However, his office notes reflected that Mrs. Shectman called on October 27, 2000 and reported that plaintiff had not been taking the Luvox. Defendant stated that plaintiff should have been taking the medication and he would have said so in the phone call.
*282 Defendant testified at trial that when he began to see plaintiff in 1991, plaintiff was complaining of depression. Plaintiff had a history of chronic mental illness. Plaintiff had responded to treatment, left defendant's care, and was treated elsewhere. Plaintiff returned to see defendant in September 1994 after a manic episode at a restaurant. Plaintiff saw defendant for ongoing follow-up visits from June 1996 to October 2000.
Defendant said that, in the time he treated plaintiff, "[t]here was no evidence, sign, symptom, indication, nothing that would indicate dangerousness, certainly nothing that would [be] imminent [or high] risk[.]" Defendant asserted that in his treatment of plaintiff before and after June 2000, he followed the same routine that he follows with other patients. Defendant would generally advise his patients to call his office if there was an emergency or problem, and if he could not be reached, to go the emergency room of the nearest hospital.
Defendant was asked whether there is a standard of care for monitoring psychiatric patients. He replied, "It's a judgment call. There is no standard." Defendant testified that there is no standard of care in terms of the frequency of visits or the type of visit. Defendant stated that he had recommended that plaintiff see him more frequently but he could not force an individual to have treatment unless the individual was civilly committed. He said, however, that plaintiff "never met [the] commitment criteria." Defendant prescribed Luvox and, in his opinion, it would have been better for plaintiff's mental state if he had taken the medication.
Plaintiff and defendant presented testimony from experts in the field of psychiatry. Plaintiff's expert was Dr. David J. Gallina, who opined that defendant deviated from the standard of care in 2000 because he failed to "appropriately monitor, supervise and assess the patient's clinical condition over a period of time when that condition was clearly deteriorating." Dr. Gallina stated that in the relevant period, there had been changes in plaintiff's medications that were causing side effects. In addition, the medications were not addressing the symptoms that plaintiff was experiencing.
Dr. Gallina said that, after the October 9, 2000 visit to defendant's office, plaintiff's condition deteriorated. Plaintiff's medications had changed and he was experiencing a "discontinuation syndrome." Plaintiff's "overall clinical state was unstable and was deteriorating." The doctor stated:
At that point, there was the necessity for very close monitoring and supervision of the patient, monitoring of the medication changes that were being made and supervision of the patient's clinical state which had been deteriorating for some period of time. It was warranted at that point for the patient to be seen frequently, certainly at least on a weekly basis and perhaps more often, which was not done. The October visit was the last time that the doctor actually saw the patient face-to-face prior to the patient's [attempted] suicide.
In the absence of that kind of supervision and monitoring in view of the medication changes that were being made, in view of the side effects that the patient was experiencing from medications, and in view of the patient's deteriorating clinical condition, it certainly was foreseeable that something bad was going to happen with this patient over a period of time if that trend was not clinically interrupted in some way. And without adequate supervision, without adequate monitoring of the medication over the next month, the patient's clinical *283 condition continued to deteriorate until finally we had the rather horrendous suicide attempt that subsequently occurred.
Defendant presented testimony from Dr. Andrew Slaby, who opined that defendant had "totally complied" with the applicable standard of care in his treatment of plaintiff. Dr. Slaby was asked whether a psychiatrist is "doing the right thing" if he instructs a patient to call if there is a problem, and advises the patient to go to the nearest emergency room if the doctor cannot be reached. Dr. Slaby replied, "Yes, he is." He added:
[t]hat is all you can really do. You cannot force a person to call ... nor can you force family members or other people to call ..., but I don't think the Shectmans themselves had seen from what I read that deterioration or they would have intervened since they were very conscientious.
The jury returned a verdict finding that defendant deviated from the accepted standard of psychiatric care in the period from June 2000 to November 2000. The jury also found that the deviation was a proximate cause of plaintiff's suicide attempt and resulting damages. In addition, the jury determined that plaintiff failed to prove that he was not capable of following defendant's instructions in the relevant period. The jury further found that defendant had not proven that plaintiff was negligent in failing to follow defendant's instructions. The jury awarded plaintiff $250,000. This appeal followed.

II.
Defendant first argues that we should order the reinstatement of the trial court's October 10, 2003 order dismissing plaintiff's complaint for failure to comply with the statute of limitations.
Plaintiff filed his complaint on June 18, 2003, and thereafter, defendant moved for dismissal of the complaint. Defendant argued that plaintiff's cause of action accrued on November 5, 2000, the date when plaintiff attempted suicide, and the complaint was untimely because it had not been filed within two years of that date, as required by N.J.S.A. 2A:14-2a.
Plaintiff opposed the motion. In an affidavit dated September 17, 2003, plaintiff stated that when he attempted to commit suicide, he had no reason to believe that his action had anything to do with defendant's treatment. Plaintiff asserted, however, that in November 2002, his parents read a magazine article which indicated that there was a connection "between the use of Paxil and an increased risk of suicidal or violent behavior."
Plaintiff said that, after being informed of the article, he contacted an attorney to determine whether his attempted suicide was due to the medication. He stated:
In or about May 2003, my attorneys informed me that the pharmacological expert they retained could not state with any certainty that Paxil caused my suicide attempt but that a possible malpractice claim existed against [defendant]. This was the first time that I was advised by anyone, including any physicians, that something [defendant] did or did not do contributed to my suicide attempt.
Plaintiff added that before May 2003, he did not know that defendant's treatment had caused or contributed to his suicide attempt. He asserted, "If it was not for the Paxil article which led me to an attorney, I would have never known I had a malpractice case against [defendant]."
The trial court held that plaintiff's complaint was untimely. The court ruled that the statute of limitations began to run on the date of the attempted suicide because *284 that was the date when plaintiff knew he was injured. We reversed. Shectman v. Bransfield, No. A-1311-03 (App.Div. June 30, 2004).
We held that "a reasonable person with as extensive a psychiatric history as plaintiff... would not necessarily" consider the suicide attempt to be an injury caused by an external force. Ibid. (slip. op. at 11). We added that even if the suicide attempt was considered to be an actionable injury, there was no evidence that plaintiff knew or should have known that the injury was related to defendant's medical treatment. Ibid. (slip. op. at 12). We observed:
Objectively, plaintiff, given his prior extensive psychiatric history, reasonably could not have suspected his treating psychiatrist to have been at fault until he became aware of the article his parents brought to his attention relating Paxil to suicide attempts.
Defendant argues that our decision to reverse the trial court's order and reinstate plaintiff's complaint was based on a misrepresentation because at trial, plaintiff never asserted a claim against defendant based on defendant's prescription of Paxil. We disagree. Our application of the discovery rule in the earlier appeal was not based on the assumption that plaintiff would necessarily assert a claim that defendant deviated from the standard of care by prescribing Paxil.
Indeed, in his affidavit, plaintiff stated that he had been advised by his attorneys that there was insufficient support for a claim against defendant based on the prescription of Paxil. Plaintiff made clear, however, that he first discovered that his suicide attempt might have some relationship to defendant's treatment when he learned of the article about Paxil.
Thus, our decision to reverse the trial court's order was not based on a misrepresentation by plaintiff. The fact that plaintiff did not pursue a claim based on the alleged wrongful prescription of Paxil does not alter our conclusion that the statute of limitations began to run when plaintiff first became aware that he may have been harmed by defendant's treatment, not when he attempted suicide.
We therefore conclude that there is no basis whatsoever to reinstate the trial court's October 10, 2003 order.

III.
We turn to defendant's contention that the trial judge erred by refusing to charge the jury on medical judgment. Defendant contends that he and the medical experts who testified at trial agreed that there is no standard of care requiring that a psychiatrist see and evaluate a patient "at any certain interval" and that the decision is left to the physician's judgment.
A physician is required to "act with that degree of care, knowledge, and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in the field." Velazquez v. Portadin, 163 N.J. 677, 686, 751 A.2d 102 (2000) (citing Walck v. Johns-Manville Prods. Corp., 56 N.J. 533, 560, 267 A.2d 508 (1970)). However, "`good treatment will not necessarily prevent a poor result.'" Ibid. (quoting Schueler v. Strelinger, 43 N.J. 330, 344, 204 A.2d 577 (1964)).
When a physician "`selects one of two courses ... either one of which has substantial support as proper practice by the medical profession, a claim of malpractice cannot be predicated solely on the course pursued.'" Ibid. (quoting Schueler, supra, 43 N.J. at 346, 204 A.2d 577). This is so because, when there are two different schools of medical opinion, "`the plain inference is that the matter must be *285 left to the good faith judgment of the experienced [physician].'" Ibid. (quoting Schueler, supra, 43 N.J. at 346, 204 A.2d 577). Therefore, the judgment charge is generally limited to "medical malpractice actions concerning misdiagnosis or the selection of one of two or more generally accepted courses of treatment." Ibid. (citing Aiello v. Muhlenberg Reg'l Med. Ctr., 159 N.J. 618, 628-29, 733 A.2d 433 (1999)).
Here, defendant requested that the judge charge the jury on medical judgment. The judge denied the application. The judge stated that he was not persuaded that the evidence established that there were two different "schools of medical treatment." The judge stated that the issue was not judgment in general but whether defendant deviated from the standard of care. We disagree with the judge's conclusion.
The record shows that the parties essentially agreed that defendant had a duty to monitor and supervise plaintiff's condition in the period from June 2000 to November 2000. The parties disagreed, however, as to whether defendant was negligent in doing so. Plaintiff's expert, Dr. Gallina, initially opined that, in the period after plaintiff's October 9th visit to defendant's office, the standard of care required "very close monitoring and supervision," and that defendant should have seen plaintiff on a weekly basis, if not more frequently.
Dr. Gallina conceded, however, that "the frequency of visits or when it's necessary for the patient to be seen by the doctor is a medical decision, and that's a decision that the doctor makes." He added:
That's part of the treatment, much like a decision as to which medication to put the patient on. The decision [as] to when the patient has to come back to see the doctor and what kind of evaluation has to be done for the patient is a medical decision that the doctor makes as part of the treatment. So, the doctor generally will see the patient, and that's true in almost ... any specialty, and then at some point [the doctor] tells the patient, I'm going to make an appointment for you or you should make an appointment tomorrow or next week, whatever the doctor feels is necessary... coming from the evaluation that he makes of the patient[.]
Dr. Gallina further testified on cross-examination as follows:
Q. Now, I'd like you to listen to this and see if you agree or disagree with this.
Question, "Is there a standard in the practice of psychiatry that tells a practicing psychiatrist how often he should see any patient?"
"The standard is not a specific number or a specific line ... [that] determines exactly the frequency of visits that a patientall patients should be seen. It depends upon a number of factors, including the history and clinical condition of the patient and the type of treatment that's being rendered. It determines or leads to the doctor's decision to follow the patient at certain intervals."
Would you agree or disagree with that statement?
A. I agree with that.
Q. Those are your words, aren't they?
A. Well, I didn't know that they were, but they sound right.
Q. I'm reading those [words] right from your deposition in this case. And you say there, in answer to the question of whether there's a standard of practice in psychiatry that tells a practicing psychiatrist how often he should see a patient. And you said, it's not a specific number or a specific line of number of visits that determines how a patient *286 should be seen. It depends upon a number of facts, including the history, clinical condition of the patient and the type of treatment that's being rendered that determines or leads to the doctor's decision to follow a patient at certain intervals, doesn't it?
A. Yes.
As stated previously, defendant testified that the manner in which a psychiatrist monitors and supervises his patient is a matter of medical judgment. Defendant stated that there is no standard of care for a psychiatrist to monitor a patient. He said that it was "a judgment call."
In addition, defendant's expert, Dr. Slaby, testified that "[t]here's no standard of care that suggests ... that a patient has to come, it's the judgment of [the] physician who's attending" the patient. Dr. Slaby explained that there is no written standard. He said "[i]t's really that [the physician] knows the patient, it's his own judgment regarding what is happening to the patient."
Thus, contrary to the trial judge's determination, there was sufficient evidence in this case of two "schools of medical treatment." As we have indicated, the medical experts testified that a psychiatrist's decision to choose one of these two courses of treatment was dependent upon a variety of factors and the choice was a matter of medical judgment. We are therefore convinced that the judge erred by failing to instruct the jury on medical judgment.
We further conclude that the absence of the charge is reversible error. We note that, during its deliberations, the jury sent the judge a note indicating that it was "having trouble establishing accepted standards." The judge then re-read to the jury the portion of the instructions pertaining to standard of care, and the jury continued its deliberations. The jury returned a verdict finding that defendant deviated from the applicable standard of care in his treatment of plaintiff. Presumably, the jury accepted Dr. Gallina's testimony on that issue. We are convinced, however, that had the jury been charged on medical judgment, it might have reached a different conclusion. Therefore, we conclude that a new trial is required.
In view of our decision, there is no need to address defendant's argument that the jury's verdict was inconsistent because it found that plaintiff understood defendant's instruction to take Luvox but was not negligent in failing to do so.
Reversed and remanded for a new trial in conformance with this opinion.