2011 UT App 431

**Ella TURNER, Plaintiff and Appellant,**

v.

**UNIVERSITY OF UTAH HOSPITALS and Clinics, University of Utah, and State of Utah, Defendants and Appellees.**

No. 20091073–CA.

Court of Appeals of Utah.

Dec. 22, 2011.

Matthew H. Raty, Sandy, for Appellant.

David G. Williams and Bradley R. Blackham, Salt Lake City, for Appellees.

Before Judges DAVIS, McHUGH, and ROTH.

## OPINION

McHUGH, Associate Presiding Judge:

¶1 Ella Turner appeals a jury verdict in favor of University of Utah Hospitals and Clinics, University of Utah, and State of Utah (collectively, the Hospital), claiming that the trial court committed multiple errors, which deprived her of a fair trial. We affirm.

## BACKGROUND[1]

¶2 On August 11, 2002, Turner was ejected from an automobile in a single-car rollover accident. At the scene of the accident, emergency responders found Turner "unconscious and unresponsive." She was first taken to the Central Valley Medical Center in Nephi and then airlifted to the Hospital. Upon arriving at the Hospital, Turner was diagnosed with brain swelling, a scalp laceration, multiple fractures of the cervical, thoracic, and lumbar spine, a liver laceration, and rib fractures. Because of the severity and number of Turner's injuries, the Hospital's doctors determined that the best treatment plan was to admit Turner to the Hospital's Neurocritical Unit (NCC) and to keep her on bed rest with spine precautions. Spine precaution protocol requires that NCC nurses move patients using the log rolling procedure, which means that every time the NCC nurses needed to move Turner to change her linens or bathe her, they were to use at least three health care employees to move her entire body in a single movement. On August 21, the Hospital performed an MRI scan on Turner, which showed injury to Turner's spinal cord and a change in alignment of her spine when compared to images from a CT scan obtained when she was admitted.

¶3 In her complaint, Turner alleges that the Hospital's NCC nurses were negligent in their care for her between August 11 and August 22, and that their negligence resulted in the injury to her spinal cord that rendered her paraplegic. Specifically, Turner alleges that the NCC nurse that admitted Turner was required to post a sign at the head of her bed to remind all care providers that Turner was a spine precaution patient and that by failing to do so until August 22, the NCC nurses breached that standard of care. Turner also alleges that the NCC nurses did not utilize the log rolling procedure during the eleven days in question and, as a result, the nurses "failed to adequately protect [Turner's] spinal cord from injury and moved her about so as to cause injury to her spinal cord."

¶4 The case was tried to a jury between October 20 and October 28, 2009. The jury unanimously found that the Hospital's NCC nurses were not negligent. Turner now appeals and requests a new trial.

## ISSUES AND STANDARDS OF REVIEW

■ ¶5 Turner argues that the trial court committed numerous errors, which deprived her of a fair trial. To begin, Turner argues that the trial court erred by rejecting her challenges for cause to a number of prospective jurors. "[A] trial court's determination of whether to excuse a prospective juror for cause should not be reversed absent an abuse of discretion." *State v. Wach*, 2001 UT 35, ¶25, 24 P.3d 948.

■ ¶6 Next, Turner contends that the trial court exceeded its discretion in its rulings on numerous evidentiary issues. First, she claims that the trial court erred by allowing the Hospital to elicit general standard of care testimony from Dr. Joel MacDonald, one of Turner's treating physicians. Second, she claims that the trial court erred by allowing Dr. MacDonald to testify as to the cause of Turner's injury and by allowing Dr. MacDonald to use a trial exhibit that had not been specifically designated. Third, Turner argues that the trial court erred by allowing Dr. Thomas Zdeblick to testify as to causation because with his testimony the Hospital offered four physicians on causation, as compared to Turner's one causation expert. Turner further claims that the imbalance in the amount of causation testimony was prejudicial. Fourth, Turner contends that the

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *Neely v. Bennett*, 2002 UT App 189, ¶2, 51 P.3d 724 (internal quotation marks omitted).

trial court erred by sustaining the Hospital's objection during Turner's cross-examination of one of the NCC nurses because by sustaining the objection Turner was precluded from eliciting damaging testimony. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269 ("With regard to our review of the exclusion of evidence, we grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion.").

¶ 7 Finally, Turner argues that the trial court improperly instructed the jury on alternative treatment methods. "A trial court's ruling concerning a jury instruction is reviewed for correctness." *Butler v. Naylor*, 1999 UT 85, ¶ 10, 987 P.2d 41. "A new trial will not be granted unless any error of the trial court was prejudicial, meaning that it misadvised or misled the jury on the law." *Id.*

## ANALYSIS

### I. Jury Selection

¶ 8 Turner contends that the trial court committed prejudicial error by denying four of her for-cause challenges to prospective jurors. According to Turner, this made it impossible for her to remove all biased jurors from the jury because she had only three peremptory strikes. The Utah Supreme Court has adopted the cure-or-waive rule, which means that in order to raise the issue of juror bias on appeal, the appealing party "must [have] exercise[d] a peremptory challenge, if one is available, against the juror unsuccessfully challenged for cause," and the challenged juror must have actually served on the jury. *See State v. Baker*, 935 P.2d 503, 510 (Utah 1997). Yet, Turner did not use all of her peremptory strikes on jurors she challenged for cause. Instead, she struck only two of those jurors and used her third strike on a juror she did not challenge for cause but suspected of being a tort reformer, which Turner defines as "one who intentionally conceals biases with the hope of getting on the jury and defeating a tort case."

¶ 9 Because Turner did not use all of her peremptory challenges on jurors that she challenged for cause, if we determine that one of the four jurors she challenged for cause was not biased, her argument is not preserved. This is so because if one of the four jurors was not biased, Turner would have had enough peremptory challenges to dismiss the remaining three prospective jurors and the trial court's error, if any, in not removing those jurors for cause would be harmless. *See id.* at 505 (explaining the cure-or-waive rule and stating that because "no ground for reversal exists unless a biased juror is actually retained on the panel," a party's argument that its for-cause challenge has been erroneously denied is preserved "only if the number of jurors the trial court erroneously refused to dismiss for cause exceeded the number of peremptories available to the [party]"). We undertake that analysis now.

¶ 10 We begin with Turner's argument that the trial court erred by failing to remove for cause a juror (Juror 1), who eventually served as the jury foreperson. In particular, Turner relies on the fact that during voir dire Juror 1 indicated that he had "high regard" for the Huntsman Cancer Center, an institution that is part of the Hospital, because he felt that it had provided excellent care to his dying wife. A trial court's discretion about whether to remove a prospective juror for cause "is limited by the Utah Rules of Civil Procedure" and precedent. *See West v. Holley*, 2004 UT 97, ¶ 13, 103 P.3d 708. A juror may be removed when "[c]onduct, responses, state of mind or other circumstances . . . reasonably lead the court to conclude the juror is not likely to act impartially. No person may serve as a juror, if challenged, unless the judge is convinced the juror can and will act impartially and fairly." Utah R. Civ. P. 47(f)(6). Further, "[v]oir dire responses revealing evidence of bias or partiality give rise to [the] presumption that a potential juror is biased, and the juror must be dismissed unless that presumption is rebutted." *West*, 2004 UT 97, ¶ 14, 103 P.3d 708. But "a presumption of bias cannot be rebutted solely by a juror's bare assurance of [his] own impartiality. . . . The trial court must

focus on the juror's expressions of attitudes, opinions, and feelings about subjects related to the case, rather than on the juror's assessment of [his] own objectivity." *Id.* ¶ 15.

¶ 11 Here, the record reflects that the trial court focused on the appropriate criteria when determining whether Juror 1 was impartial. Specifically, the trial court asked Juror 1 about his reference to the excellent care the Huntsman Cancer Center had provided to his late wife. Juror 1 replied, "My thought process was I think I could be fair and unbiased but I don't know, you know, if I feel like she got excellent treatment. So I wouldn't be aware of any bias but I don't know if there's any subconscious influence [that] could be there or not." The trial court then asked, "I guess what I'm really interested in knowing is taking into consideration what you know about this present case and the experience that you described ... with the Huntsman Cancer Center, can you be fair and impartial in this case?" Juror 1 replied, "I think I can but I try to point out here, I do have a high regard for [the Huntsman Cancer Center] ... but I do believe that I could be fair according to the facts of the case." After this examination, Turner challenged Juror 1 for cause, arguing that "he couldn't promise that he wouldn't have a subconscious bias and he talked about ... that very emotional time in his life and how he came to highly regard the university and the care they were providing to his wife." In response, the Hospital argued that Juror 1 "has stated as clearly as he can ... he doesn't recognize any bias, he doesn't believe he has a bias, he will do his best to be fair and he can't guarantee that there's not a subconscious bias. Every juror, prospective juror ... is in that exact same situation." The trial court denied the for-cause challenge to Juror 1 because based on the "face-to-face" communication that it had just had with him, which included not only Juror 1's "actual responses but his expressions, his intonation," the trial court "saw a panel member trying to give us full and complete honest

answers." The trial court explained that it did not think the situation involving Juror 1's late wife would color his ability to be fair.

■ ¶ 12 We do not agree with Turner that the trial court relied solely on Juror 1's self-assessment to determine that he would be impartial. Instead, the trial court focused on the "juror's expressions of attitudes, opinions, and feelings about subjects related to the case," *see West*, 2004 UT 97, ¶ 15, 103 P.3d 708, and then thoughtfully determined that he would be an unbiased juror. We conclude that the trial court acted within its discretion in ruling that Juror 1 had rebutted any presumption of bias or partiality.[2] *See id.* ("Rebutting a presumption of bias or partiality may be accomplished if the challenged juror, upon further questioning, provides reason to believe that [his] previous statements showing evidence of bias were merely [a] product of a light impression and not one that would close the mind against the testimony that may be offered in opposition." (internal quotation marks omitted)).

¶ 13 Because we hold that the trial court did not commit error by failing to remove Juror 1 for cause, we need not address whether the trial court erred by failing to remove the other challenged juror who served on the jury. This is because Juror 1 was not biased and, therefore, Turner had enough peremptory challenges to remove all three of the remaining jurors she unsuccessfully challenged for cause. Because Turner did not use all of those peremptory challenges on the jurors she challenged for cause, she waived any argument that the trial court erred in failing to remove those jurors. *See State v. Baker*, 935 P.2d 503, 505, 510 (Utah 1997).

## II. Admission and Exclusion of Evidence

### A. Dr. MacDonald's Testimony as to the Standard of Care

■ ¶ 14 Turner's first challenge to the trial court's admission of evidence is in re-

---

2. However, we reemphasize that "[a]lthough we accord trial courts considerable discretion in ruling on motions to dismiss jurors for cause, we ... encourage[] them to err on the side of dismissing questionable jurors." *West v. Holley*,

2004 UT 97, ¶ 12, 103 P.3d 708. When there are other potential jurors available, there is simply no reason to jeopardize the future verdict by making it vulnerable to an attack based on the bias or partiality of the jury.

gard to testimony from Dr. MacDonald, one of Turner's treating physicians and a designated expert. Turner argues that the trial court exceeded its discretion and improperly overruled Turner's objection to the Hospital's question seeking testimony from Dr. MacDonald regarding the standard of care provided to Turner by all of her medical providers. Although we agree, we conclude that the error was harmless.

¶ 15 The Hospital asked Dr. MacDonald, "Do you have an opinion as to whether the medical and surgical care of Ms. Turner during [the] period of time from August 11 to August 21 was appropriate and within the applicable standard of care?" Turner objected to the question on the basis of lack of foundation. The trial court overruled the objection.[3] Dr. MacDonald then responded, "Well, in my opinion Ms. Turner received the highest standard of care. I think that given the combination of injuries that she presented with, there was a high chance of mortality and substantial morbidity and ... I think it's remarkable that she is with us today."

■■■ ¶ 16 "As a threshold matter, a treating physician must meet the requirements to be an expert set out in Utah Rule of Evidence 702 and may not testify to matters that are beyond the expert's own knowledge, skill, experience or other specialized training." *Drew v. Lee,* 2011 UT 15, ¶ 29, 250 P.3d 48. The Hospital argues that the trial court did not err because "Dr. MacDonald was not asked to comment on care that was outside his involvement in treating [Turner]." The Hospital points out that Dr. MacDonald was asked about the standard of "medical and surgical care" Turner received, not the nursing care she received. Thus, because the foundation had been laid that Dr. MacDonald had collaborated with other doctors while treating Turner, the Hospital contends that he had the requisite knowledge to answer questions about the care she received from other doctors. However, it is not clear that the Hospital's question about "medical and surgical care" did not include the nursing

care Turner received at the Hospital. Because Turner alleges only that the Hospital's NCC nurses breached the standard of care, either Dr. MacDonald's comment that Turner "received the highest standard of care" was irrelevant because the Hospital's doctors' conduct was not at issue, or he was opining about the care provided by the NCC nurses, for which no foundation had been laid. *See generally* Utah R. Evid. 702 (requiring an expert witness to be qualified "by knowledge, skill, experience, training, or education," in order to testify in the form of opinion). Thus, we agree with Turner that the trial court exceeded its discretion by overruling Turner's objection to the Hospital's question eliciting Dr. MacDonald's opinion about whether all of the medical and surgical care Turner received while hospitalized met the applicable standard of care.

■■■ ¶ 17 However, "a trial court will not be reversed for an abuse of discretion unless there is a reasonable likelihood that the verdict would have been different if the trial court had [excluded] the expert testimony." *Campbell v. State Farm Mut. Auto. Ins. Co.,* 2001 UT 89, ¶ 13, 65 P.3d 1134 (alteration in original) (internal quotation marks omitted), *rev'd on other grounds,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Even if the trial court had excluded Dr. MacDonald's answer to the Hospital's improper question, we cannot say that the jury's verdict would have been different. Because the issue in the case was whether the NCC nurses breached the standard of care by failing to log roll Turner and failing to post a sign warning that Turner was a spine precaution patient, we look to the strength of evidence on that issue to determine if there is a reasonable likelihood that absent Dr. MacDonald's testimony the verdict would have been different.

¶ 18 We begin with a review of the testimony of Turner's nursing expert, Nurse Dawn Brinker. From Nurse Brinker's testimony it is apparent that Turner's theory was cen-

---

**3.** The Hospital argues that Turner's objection was untimely. This argument is technically correct, because the objection should have followed the question, "And what is your opinion?" However, this argument is without merit because it is obvious from the trial transcript that the trial court and the Hospital were aware that Turner was objecting to the substance of Dr. MacDonald's opinion and not simply to whether Dr. MacDonald had an opinion on the subject.

tered on the premise that because Turner's nursing charts do not consistently note that she was log rolled, she must not have been. Turner also focused on the fact that a sign was posted above Turner's bed after an MRI on August 21 revealed injury to her spinal cord but that no sign was posted before the MRI, even though she had been on spine precautions continuously since she was admitted to the Hospital.

¶ 19 A review of the record indicates that the Hospital undermined Turner's theory by effectively cross-examining Nurse Brinker. First, the Hospital used Nurse Brinker's deposition to illustrate apparent, significant inconsistencies with her trial testimony. Second, the Hospital established that the only reason that Nurse Brinker thought the NCC nurses had breached the standard of care was because the nurses had not made notations in Turner's chart indicating that they had log rolled Turner. Nurse Brinker repeated throughout cross-examination that it was a nursing maxim that "if you didn't chart it, you didn't do it" and thus pointed to the omissions in Turner's chart as indisputable proof that the NCC nurses had failed to log roll her. However, Nurse Brinker could not provide any other evidence that the NCC nurses had failed to log roll Turner and, contrary to logic, Nurse Brinker would not admit that it was possible that a nurse could have performed routine care for a patient but failed to write it down. Third, Nurse Brinker admitted that at her hospital in Kansas the nurses do not post a sign at a spine precaution patient's bed and that posting a sign is not part of the national standard of care for spine precaution patients. Despite that admission, Nurse Brinker insisted that it was a breach of the standard of care for

the NCC nurses not to post a sign because it was part of the Hospital's guidelines, even though that fact was in dispute.

¶ 20 In contrast to Nurse Brinker's testimony, the Hospital's nursing expert, Nurse Rikki Worthen, testified that there was not any evidence that the NCC nurses breached the standard of care. She explained that the nursing charts notified the NCC nurses that Turner was a spine precaution patient that needed to be log rolled, that NCC nurses always log roll a patient unless told to do otherwise, and that just because a nurse does not chart every act of care administered to a patient does not mean that the act did not happen. Turner's cross-examination of Nurse Worthen is not available for our review.[4]

¶ 21 After evaluating the relative strength of the extensive testimony about the nursing standard of care, we are not convinced that Dr. MacDonald's one comment about the standard of "medical and surgical" care received by Turner would have changed the jury's verdict. Instead, given the strength of Nurse Worthen's testimony and the weakness of Nurse Brinker's testimony, we conclude that the jury would have reached the same verdict based on the properly admitted testimony even in the absence of Dr. MacDonald's opinion.

B. Dr. MacDonald's Causation Testimony[5]

¶ 22 Turner's next challenge to the trial court's admission of evidence relates to the causation evidence the Hospital presented from Dr. MacDonald. Turner claims that the trial court exceeded its discretion by allowing Dr. MacDonald to testify as an expert when he was not designated as such and that the trial court erred by allowing Dr.

4. The parties have provided the transcript for only the direct, redirect, recross, and further redirect examination of Nurse Worthen.

5. The Hospital argues that Turner's challenges to the admission of causation evidence are moot because the jury found that the NCC nurses were not negligent and, thus, never reached the issue of causation. Typically, we would agree with that assessment. Under the facts of this case, however, the issues of breach and causation are so intertwined as to be inseparable. The Hospital's causation theory was that Turner's spinal cord was injured in the car accident before she

arrived at the Hospital. If the jury believed that theory, it could have more easily found that the NCC nurses were not negligent. In contrast, without an explanation for the fact that Turner's spinal cord damage did not appear on the CT scan taken upon her admission but was revealed by the MRI performed ten days later, Turner's argument that the NCC nurses negligently cared for her during that ten days may have carried more weight. For this reason, we address Turner's challenges to the admission of causation evidence on their merits.

MacDonald to augment his testimony with a trial exhibit that was not specifically designated.

¶ 23 Turner objects to Dr. MacDonald's opinion testimony because "she had no opportunity to prepare for and controvert the opinions, take an expert witness deposition, disqualify Dr. MacDonald from rendering incompetent opinions, or secure a rebuttal expert." The Hospital responds that Turner waived her objection to Dr. MacDonald's opinion testimony because she designated as experts "[a]ny and all healthcare providers who treated [Turner] for injuries she sustained by the negligence of [Hospital] or were involved in [Turner]'s care." Additionally, in the Hospital's expert witness designations, it "reserve[d] the right to call any expert witnesses designated by [Turner]." We are persuaded that these designations should have alerted Turner to the possibility that the Hospital would elicit opinion testimony from Dr. MacDonald.

¶ 24 In *Boice v. Marble*, 1999 UT 71, 982 P.2d 565, the plaintiff brought a medical malpractice suit against the defendant doctor. *See id.* ¶ 4. Two months before trial, the plaintiff's expert witness notified the parties that he no longer intended to testify as an expert witness, and the plaintiff moved to substitute a new expert. *See id.* The trial court denied the motion and stated that the plaintiff's treating physician could only testify as a fact witness. *See id.* It then granted summary judgment for the defendant because the plaintiff did not have an expert witness to establish the elements of the plaintiff's medical malpractice claim. *See id.* ¶ 5. The Utah Supreme Court held that the trial court erred in prohibiting the plaintiff's treating physician from testifying as an expert, noting first that both parties "said in their expert designation reports that they reserved the right to call as experts any of [the plaintiff's] treating physicians." *Id.* ¶ 12. The court then reasoned that "[b]ecause both [parties] reserved the right to call *any* of [the plaintiff]'s treating medical pro-

viders, both faced the possibility of having the other party call any medical provider who treated [the plaintiff] prior to the trial as an expert." *Id.* Here, both parties designated Turner's treating physicians as experts without limitation as to the scope of the testimony. Thus, as in *Boice*, both parties "faced the possibility of having the other party call any medical provider who treated [Turner]." *Id.* As a result, we agree with the Hospital that because Turner designated her treating physicians as experts, and the Hospital reserved the right to call any of the expert witnesses designated by Turner, she should have been aware that those doctors could offer opinions within their expertise.

¶ 25 Further, treating doctors designated as experts may opine as to causation, even if they have not submitted an expert report. *See Drew v. Lee*, 2011 UT 15, ¶ 30, 250 P.3d 48 (stating that if the trial court finds that the treating physicians the plaintiff has identified as experts are actually treating physicians, then "it should . . . let them offer an opinion about causation and prognosis without filing an expert report"). As a designated expert and a treating physician, Dr. MacDonald could opine as to the cause of Turner's injury. Thus, once Turner designated all of her treating physicians as experts, she was on notice that their opinions might be elicited at trial by the Hospital.

¶ 26 However, even as a designated expert, Dr. MacDonald's testimony should have been limited to his fields of expertise. *See* Utah R. Evid. 702. Turner argues that Dr. MacDonald's testimony regarding Turner's thoracic spine [6] was improper because he was in charge of the treatment of only her cervical spine.[7] Indeed, Dr. MacDonald admitted that Dr. John Braun was in charge of treating Turner's thoracic spine. Nevertheless, the Hospital argues that the care of Turner's thoracic spine was not completely divorced from the treatment of her cervical spine. In addition, Dr. MacDonald testified

6. "Thoracic vertebrae" are "the segments of the vertebral column, usually [twelve], which articulate with ribs to form part of the thoracic cage." *Stedman's Medical Dictionary* 1957 (27th ed. 2000).

7. "Cervical vertebrae" are "the seven segments of the vertebral column located in the neck." *Id.*

that Turner's "spinal cord injuries affect the total care of the patient and so by necessity there's a collaborative process that occurs between all of the doctors that are taking care of the patient." Finally, Dr. MacDonald testified that he practices in "complex spinal disorders" and "trauma."

¶ 27 The Utah Supreme Court has "held that trial courts have discretion in determining whether specific testimony offered by an expert should be allowed." *See Green v. Louder,* 2001 UT 62, ¶ 30, 29 P.3d 638 (internal quotation marks omitted). Given that Dr. MacDonald was one of Turner's treating physicians, had an expertise in spinal cord treatment, and testified that managing her injuries was a collaborative process, we cannot say that the trial court exceeded that discretion in allowing Dr. MacDonald to testify with regard to the causation of Turner's thoracic spine injuries.

¶ 28 Turner also objects to Dr. Mac-Donald's use of Turner's thoracic CT scan, arguing that the Hospital did not properly disclose the images from the scan as a trial exhibit under rule 26(a)(4)(C) of the Utah Rules of Civil Procedure.[8] Rule 26(a)(4)(C) requires that

> [a] party shall provide to other parties the following information regarding the evidence that it may present at trial … an appropriate identification of each document or other exhibit, including summaries of other evidence, separately identifying those which the party expects to offer and those which the party may offer if the need arises.

*Id.* Turner contends that the Hospital did not comply with this rule because although the Hospital designated all of Turner's medical records from the Hospital, it did not "specifically designate" which images from the CT scan it was going to use. The trial court overruled the objection but required the Hospital to lay appropriate foundation showing that the images from the scan the Hospi-

tal used were, in fact, from Turner's hospital records and that Dr. MacDonald had reviewed them at the time he treated Turner.[9]

¶ 29 The Hospital now argues that Turner's objection to the admission of the images from the scan is waived for two reasons. First, Turner specifically designated the CT scan as a trial exhibit, and then she used select images from it at trial. Because Turner relied on some images from the CT scan, the Hospital argues that Turner's objection to the Hospital also relying on images from the CT scan—albeit different images— is waived. We agree that Turner cannot rely on a part of a trial exhibit but then argue that another part of that same exhibit is inadmissible. *See State v. Tuttle,* 16 Utah 2d 288, 399 P.2d 580, 582 (1965) (holding that the defendant waived his objection to the state's trial exhibits because he also relied on them as evidence). Second, the Hospital argues that Turner waived her objection to the CT scan by not objecting to the listing of all of Turner's medical records when she submitted her other objections to the Hospital's trial exhibits. Utah Rule of Civil Procedure 26(a)(4)(C) states that if a party does not object within fourteen days of the other party's trial exhibit disclosures, the objection is waived, unless it involves certain identified objections that are not relevant here. *See id.* We agree that Turner waived her objection to the Hospital using images from her CT scan when she failed to object to the Hospital's designation of her entire medical record as a trial exhibit and by using portions of the CT scan at trial.

**C. Dr. Zdeblick's Testimony and Turner's Rule 403 Objection**

¶ 30 Turner also argues that by allowing four physicians to testify as to causation for the Hospital, as opposed to Turner's one causation expert, the trial court unfairly prejudiced Turner's case under rule 403 of

---

8. Rule 26 of the Utah Rules of Civil Procedure has since been amended, but the amendment is only effective as to cases filed on or after November 1, 2011, and thus does not apply to this case.

9. On direct examination, Dr. MacDonald testified that he reviewed Turner's thoracic CT scan at the time of Turner's treatment; however, on cross-examination Dr. MacDonald qualified his earlier statement by saying that he had "a general recollection that [he] reviewed [the thoracic CT scan] but that [he did not] have [a] specific recollection."

the Utah Rules of Evidence. However, at trial, Turner objected only to Dr. Zdeblick's testimony, claiming it was unnecessarily cumulative and prejudicial in light of the other three doctors that were to testify as to causation.[10] As a result, we evaluate only whether the trial court erred and prejudiced Turner by allowing Dr. Zdeblick to testify as to causation. *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 (stating that issues not raised before the trial court may not be raised on appeal).

¶ 31 Turner first moved to preclude Dr. Zdeblick from testifying under rule 403 at trial. When the trial court inquired why Turner had not filed a pretrial motion in limine to exclude Dr. Zdeblick's testimony, Turner responded, "Dr. MacDonald was allowed to testify so extensively as an expert and now we've heard from two causation experts on the case and there's nothing left for Dr. Zdeblick to cover on causation." Turner further argued that Dr. Zdeblick's testimony "would be a waste of time for the Court and a needless presentation of cumulative evidence," and that "it would be highly prejudicial to the jury to have four different experts basically testify as to causation." She also claimed that Dr. Zdeblick was not timely designated as a trial witness. The trial court then clarified that the only thing that had precluded Turner from bringing the motion to exclude Dr. Zdeblick's testimony earlier was that she had expected the Hospital to have three experts testify to causation but now, because of Dr. MacDonald's testimony, the Hospital had four. Turner admitted that the trial court's understanding of the situation was more or less correct.[11]

¶ 32 The trial court then denied Turner's objection to Dr. Zdeblick's testimony both as

untimely and because the court was not persuaded that admission of the testimony would violate rule 403. The trial court stated that it thought rule "403 does presume that evidence is admissible and requires a demonstration ... [that the evidence is] highly prejudicial" and that it could not make that determination based on a number count of the experts.

¶ 33 In evaluating Turner's claim that Dr. Zdeblick's testimony was unfairly prejudicial, we again apply a deferential standard of review. "We review a trial court's decision to admit or exclude evidence under [r]ule 403 of the Utah Rules of Evidence under an abuse of discretion standard, and will not overturn a lower court's determination of admissibility unless it is beyond the limits of reasonability." *Diversified Holdings, LC v. Turner*, 2002 UT 129, ¶ 6, 63 P.3d 686 (internal quotation marks omitted). Even if we could say that the trial court's decision to admit the evidence was "beyond the limits of reasonability," *see id.*, something we do not decide, we are not convinced that the jury's verdict would have been any different if it had heard three, rather than four, physicians testify that Turner's spinal injuries were caused by the car accident. *See Campbell v. State Farm Mut. Auto. Ins. Co.*, 2001 UT 89, ¶ 13, 65 P.3d 1134, *rev'd on other grounds*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Consequently, we hold that the trial court did not commit prejudicial error in allowing Dr. Zdeblick to testify as to causation.

## D. Nurse Phelps's Testimony

¶ 34 Turner's last challenge to the evidentiary rulings is that the trial court

---

10. On appeal, Turner argues that Dr. Braun's deposition testimony contributed to the cumulatively prejudicial effect of the Hospital's causation witnesses. However, at trial, Turner objected to Dr. Braun's deposition testimony only on the basis that he was not designated as an expert and because his causation opinions were formed outside the scope of his care of Turner. Like Dr. MacDonald, *see supra* ¶¶ 22–27, Dr. Braun was a designated expert and treating physician who could offer opinions on causation. *See Drew v. Lee*, 2011 UT 15, ¶ 30, 250 P.3d 48. Additionally, Turner presents no evidence that Dr. Braun's opinion that the car accident probably caused

Turner's spinal cord injury was formed outside the scope of his care of Turner. As a result, we determine that the trial court did not err in allowing the Hospital to read some of Dr. Braun's deposition testimony into the record, including his opinion as to causation.

11. The Hospital argued that its two designated witnesses, Dr. Peter Klara and Dr. Zdeblick, had different specialities and that the other two treating physicians, Dr. MacDonald and Dr. Braun, were not exclusively causation experts.

improperly restricted the cross-examination of Nurse Cynthia Phelps. "The trial judge is allowed a wide discretion in his control over the examination of witnesses—lay and expert alike." *Perkins v. Fit–Well Artificial Limb Co.*, 30 Utah 2d 151, 514 P.2d 811, 813 (1973). With the proper deference to the trial court's advantageous position on whether to admit or exclude evidence in mind, we now review whether the trial court erred when it sustained the Hospital's objections to two of Turner's questions on cross-examination.

¶ 35 Under rule 611(b) of the Utah Rules of Evidence, "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." *Id.* R. 611(b). Thus, we start by examining the scope of Nurse Phelps's direct examination. On direct, the Hospital questioned Nurse Phelps about her position at the Hospital in 2002 when Turner was a patient, the education she provided to other nurses in the NCC unit, her understanding of the proper way to log roll a patient, the number of beds and nurses in the NCC unit now and in 2002, whether the nurses in the NCC unit were "close knit," whether she had ever heard of someone in the NCC unit "attempting to move Ms. Turner or any other patient for that matter on spine precautions by themselves," whether the NCC nurses posted signs for spine precaution patients, and whether Nurse Phelps reviewed her own notes from the shift in which she took care of Turner.

¶ 36 On cross-examination, Turner first tried to attack Nurse Phelps's credibility by comparing her testimony at trial with her deposition testimony. Next, Turner addressed Nurse Phelps's assertion that Turner was cared for only by the senior, more experienced nurses. Specifically, Turner took Nurse Phelps through Turner's chart and asked about the age and experience of each nurse who had signed it. The Hospital objected on the ground that this line of questioning exceeded the scope of direct examination and lacked foundation. The trial court sustained the objection to the extent that Turner's questions exceeded the scope of direct examination but allowed questioning about the level of experience of the other

nurses in the unit provided that Turner could lay a proper foundation. Thus, Turner continued to ask Nurse Phelps about the other NCC nurses, including questions about Katie Buddo, who was not a nurse, but a health care assistant in the NCC unit during 2002. Eventually, Turner asked, "And isn't it true what was really going on is you were having problems with staffing and so you let Katie Buddo be the nurse for [Turner] that night because you didn't have someone else?" At that point, the Hospital objected on the grounds of lack of foundation and that the question called for speculation. The trial court sustained the objection.

¶ 37 Turner now argues that the trial court improperly sustained the objection because Turner "was on the verge of bringing to light what was really going on in the NCC and how Ella Turner's spinal cord came to be injured." According to Turner, there was nothing improper about the question. We disagree. Indeed, considering that Nurse Phelps did not testify about other nurses on direct examination, the trial court gave Turner a fair amount of leeway on cross-examination. Despite that latitude, Turner did not establish how Nurse Phelps would have obtained personal knowledge about whether a health care assistant was put in charge of caring for Turner during a shift. Without foundation concerning the basis of Nurse Phelps's knowledge, it appeared that Turner was asking her to speculate on that matter. *See* Utah R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Thus, the trial court did not err in sustaining the Hospital's objection to the question.

¶ 38 Turner also contends that the trial court erred by sustaining the Hospital's objection to a question posed to Nurse Phelps about the length of another nurse's shift. Turner first asked Nurse Phelps about the one shift in which she personally cared for Turner. After Nurse Phelps clarified that she cared for Turner during a six-hour shift, Turner asked her to identify the nurse who cared for Turner before Nurse Phelps's shift began. Relying on Turner's

chart, Nurse Phelps testified that Nurse Andrew Miller had cared for Turner prior to her own arrival. Turner then asked Nurse Phelps if Nurse Miller had worked an eighteen-hour shift. The Hospital objected on the ground that the question exceeded the scope of direct examination, *see* Utah R. Evid. 611, and the trial court sustained the objection. Again, the trial court did not err. While the question had the same foundational deficiencies as some of Turner's prior questions, it was also beyond the scope of direct examination. The Hospital did not elicit any testimony from Nurse Phelps about the hours worked by other nurses. Where the trial court had already given Turner the opportunity to ask questions beyond the scope of direct examination and Turner had failed to lay a proper foundation for the questions posed, the trial court acted within its discretion in putting an end to the line of questions. As a result, the trial court did not err in sustaining the Hospital's objection to the question asking Nurse Phelps to testify with regard to the length of Nurse Miller's shift.

¶ 39 In sum, the trial court has broad discretion to decide whether to admit or exclude evidence. Among the several challenges Turner makes to the trial court's evidentiary rulings, we determine that only the decision to admit Dr. MacDonald's opinion that all of the medical and surgical services provided to Turner met the standard of care exceeded the trial court's discretion. However, only the nursing care was challenged by Turner. In light of the strong testimony of the Hospital's nursing expert in comparison to Turner's nursing expert, we are not convinced that the jury's verdict would have been different in the absence of Dr. MacDonald's opinion. *See Campbell v. State Farm Mut. Auto. Ins. Co.*, 2001 UT 89, ¶ 13, 65 P.3d 1134, *rev'd on other grounds*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

## III. Jury Instruction

¶ 40 Turner's last challenge is that the trial court committed harmful error by giving jury instruction thirty concerning alternative treatment methods. The instruction states,

When there is more than one method of treatment that is approved by a respectable portion of the medical community, and no particular method is used exclusively by all providers, it is not medical malpractice for a provider to select one of the approved methods, even if it later turns out to be a wrong selection, or one not favored by some other providers. The provider has the burden to prove that the method used is approved by a respectable portion of the medical community.

Turner argues that the Hospital was not entitled to this jury instruction because the Hospital did not present sufficient evidence that not posting a sign cautioning that a patient is on spine precautions is an alternative treatment method. We need not address this issue further, however, because jury instruction thirty "presents only one of several theories upon which the jury could have relied in finding for [the Hospital]." *See Butler v. Naylor*, 1999 UT 85, ¶ 20, 987 P.2d 41 (holding that instructing the jury as to alternative methods of treatment was harmless).

When a civil case is submitted to a jury on several alternative theories and the jury does not identify which theory or theories it relied on in reaching its verdict, we may affirm the verdict if the jury could have properly found for the prevailing party on any one of the theories presented.

*Id.* ¶ 21 (quoting *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 466 (Utah 1996)). Here, as was explained in instruction twenty-seven, the jury could have based the no-cause verdict upon a finding that the NCC nurses always log rolled Turner. *See Stevensen 3rd E., LC v. Watts*, 2009 UT App 137, ¶ 26, 210 P.3d 977 ("In reviewing a jury verdict, we view the evidence in the light most supportive of the verdict[ ] and assume that the jury believed those aspects of the evidence which sustain its findings and judgment."). If the jury was persuaded by the Hospital's evidence that the NCC nurses never varied from the log rolling practice, it could find that the nurses did not breach the standard of care, regardless of whether they were

supposed to post a sign. Thus, "even if the trial court had erred by giving instruction [thirty], the error would be harmless as the jury could have reached the no-cause verdict on [this] alternative theor[y]."[12] *Butler*, 1999 UT 85, ¶ 21, 987 P.2d 41.

## CONCLUSION

¶ 41 In sum, the trial court did not err when it denied Turner's for-cause challenge to Juror 1. As a result, Turner waived any other challenge to juror bias because she did not use all of her peremptory challenges on jurors she unsuccessfully challenged for cause. With regard to the admission or exclusion of evidence, the trial court did not exceed its discretion except in one instance, in which it improperly overruled Turner's objection to a question seeking Dr. MacDonald's opinion as to the standard of care rendered by all medical and surgical professionals. Because we are convinced that the verdict would not have been different in the absence of Dr. MacDonald's opinion, the error was harmless. Finally, even if the trial court erred by giving the jury instruction on alternative treatment methods, Turner can show no harm because the jury could have reached its verdict on the alternative theory that the nursing staff consistently log rolled Turner.

¶ 42 Affirmed.

¶ 43 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and STEPHEN L. ROTH, Judge.

---

12. Jury instruction thirty is instruction CV324 from the Model Utah Jury Instructions (MUJI), Second Edition. *See* MUJI 2d CV324 (Utah State Bar 2011), *available at* http://www.utcourts.gov/resources/muji. We highlight that the committee notes following the model instruction state that "[t]he drafting subcommittee was not unanimous in its approval of this instruction, so counsel and the trial court should review it with caution." *See id.* Indeed, our review of the use of this instruction in other jurisdictions did not locate any cases where the standard of care in dispute was the method by which a patient care instruction was communicated. *See, e.g., Shectman v. Bransfield*, 403 N.J.Super. 487, 959 A.2d 278, 284–85 (N.J.Super.Ct.App.Div.2008)

(holding that the trial court erred when it failed to use an alternative treatment method instruction because there were two schools of thought on how closely a psychiatrist should monitor a patient); *Clark v. Doe*, 119 Ohio App.3d 296, 695 N.E.2d 276, 279–81 (1997) (concluding that one of the two jury instructions the trial court gave on alternative treatment methods was correct in a medical malpractice case involving treatment of a leg fracture); *Housel v. James*, 141 Wash. App. 748, 172 P.3d 712, 718 (2007) (concluding that the instruction was proper when the doctor had "three treatment choices: additional testing, watchful waiting, or surgical repair of the hernia").