727 S.E.2d 443

**Bobby and Amanda MESSER, Petitioners**

v.

**HAMPDEN COAL COMPANY, LLC, Respondent.**

No. 11–0469.

Supreme Court of Appeals of West Virginia.

Submitted: March 6, 2012.

Decided: May 16, 2012.

Scott Segal, Victor Woods, The Segal Law Firm, Charleston, West Virginia, Counsel for the Petitioners.

Thomas P. Mannion, Mannion & Gray Co., L.P.A., Charleston, West Virginia, Counsel for the Respondent.

McHUGH, J.

This matter is before this Court upon an appeal by Bobby and Amanda Messer (hereinafter "Petitioners") from an order of the Circuit Court of Wyoming County (hereinafter "trial court") denying their motion for a new trial. The Petitioners contend that the trial court erred in refusing to strike a prospective juror for cause. Upon thorough review of the briefs, arguments of counsel, record, and applicable precedent, this Court affirms the lower court's decision.

I. Factual and Procedural History

On September 15, 2005, Petitioner Bobby Messer, while employed by Rectron, Inc., (hereinafter "Rectron") as a lineman, came into contact with an energized electric transmission line in Mingo County, West Virginia, and suffered injuries which ultimately necessitated the amputation of his left arm and right leg. At the time of this accident, Rectron was working on behalf of its affiliate, Electric Line Company, Inc., (hereinafter "Electric Line") in the performance of electrical services for Hampden Coal Company, LLC (hereinafter "Hampden"). Although certain portions of the power circuitry had been tested to determine if they were energized, the power line on which Mr. Messer was working on the day of the accident had not been properly tested, and Mr. Messer had been instructed to remove certain transformers and cut-out switches from an electric pole. That phase of the circuitry had been utilized by Alltel Communications of Ohio No. 3, Inc., (hereinafter "Alltel") to power a cellular phone tower, and the energized phase had branched off from the main power line at a point between the location of prior testing and the location where Mr. Messer was injured.

The Petitioners filed a complaint on October 11, 2006, alleging that defendants Rectron and Electric Line had acted with deliberate intent, resulting in the injury to Mr. Messer. The Petitioners also included a common-law negligence and trespass assertion against defendant Alltel. Through a subsequent series of amendments, the Petitioners added claims against Hampden; Rockhouse Creek Development, LLC; Morlan Enterprises, Inc.; and Paul Kerns, other entities apparently either having an ownership interest in the property upon which the accident occurred or having some degree of connection to the electrical work being performed on the site. Prior to the trial of this matter, the Petitioners settled with or voluntarily dismissed all parties except Hampden, and no issue regarding those other entities is before this Court.

The Petitioners' central allegation at trial was that Hampden had been negligent in failing to disclose the active status of the electrical line upon which Mr. Messer was injured. An expert for the Petitioners, Mr. Roger Bybee, P.E., opined that Hampden

had failed to discharge its duty to confer with personnel from Electric Line and/or Rectron prior to the performance of any electrical work and to inform them of the hazards which existed in a partially-energized power line.

In preparation for trial of this matter, a *voir dire* examination was conducted of potential jury members on September 9, 2009. Potential juror, Mr. Robert Helmandollar, explained that he had earned a degree in electrical engineering technology and was employed by a coal company as a general maintenance foreman. He had performed electrical work, including working on power lines and using equipment such as rubber gloves, insulated poles, and voltage detection devices. In discussing the responsibilities of the contractors hired to work on electric lines, Mr. Helmandollar said those contractors "were responsible for locking and tagging out the power source." He also asserted his belief that insulated gloves were required by law and could "protect you against voltage . . . ."

Upon further questioning by counsel for the Petitioners, Mr. Helmandollar stated that the expert electrical testimony expected at trial and the necessity to disregard his own beliefs and experience would not make him uncomfortable. When questioned by counsel for Hampden, Mr. Helmandollar further stated that he would be able to serve as an unbiased, fair juror and would premise his decisions upon the evidence and instructions provided by the trial court.

Counsel for the Petitioners ultimately moved to excuse Mr. Helmandollar for cause. When the trial court requested a reason for the motion to excuse, counsel for the Petitioners explained as follows: "His education, training and experience. I don't—it's a lot like I said, it's like putting a doctor in a malpractice case. It simply—" The court then asked counsel for Hampden if there were any objections. Hampden's counsel asserted that Mr. Helmandollar had stated that he could be impartial and could set aside his personal experience to make a determination based on the evidence and the court's instructions. The court refused to excuse Mr. Helmandollar for cause, and counsel for the

Petitioners thereafter used a peremptory strike to remove Mr. Helmandollar from the jury.

Subsequent to trial of this matter, the jury returned a verdict for Hampden on September 15, 2009. The Petitioners filed a motion for a new trial on September 28, 2009, as amended on October 16, 2009, alleging that Mr. Helmandollar should have been removed for cause based upon the fact that he (1) stated opinions during *voir dire* that potentially conflicted with those of the Petitioners' electrical engineering expert and (2) possessed such professional education, training, and experience in the field of electrical engineering that his presence upon the jury would have caused his opinions to unduly influence the jury's deliberations on the central issue in the case. The Petitioners' motion was denied by order entered September 29, 2010.

The trial court explained as follows in its Order Denying Amended Motion for New Trial: "In the initial Motion for New Trial, Plaintiffs allege that juror Robert Helmandollar expressed the view that based upon his training and experience as an electrical engineer, any person who is injured by electricity must be at fault for causing such accident." After a review of the trial transcript, the trial court found no merit to the Petitioners' assertion and noted that "[t]he reason plaintiffs moved to strike Mr. Helmandollar as a juror was because of his education, training and experience in electricity." Further, the trial court noted that the Petitioners' Amended Motion for New Trial added the allegation that potential "Juror Helmandollar's expertise in electricity was such that he was biased against the plaintiff." The trial court found, however, that "the transcript shows that the only reason that plaintiffs moved to remove Mr. Helmandollar was because of his education, training and experience." The Petitioners now appeal the trial court's denial of their motion for a new to trial.

## II. Standard of Review

In reviewing a trial court's rulings, this Court applies a two-prong deferential standard of review to the court's findings and conclusions. *See Doe v. Wal–Mart Stores, Inc.*, 210 W.Va. 664, 558 S.E.2d 663 (2001).

Specifically, "[w]e review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review." Syl. Pt. 2, in part, *Walker v. West Virginia Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

■ This Court has also succinctly explained that "[t]he determination of whether a prospective juror should be excused to avoid bias or prejudice in the jury panel is a matter within the sound discretion of the trial judge." *O'Dell v. Miller*, 211 W.Va. 285, 288, 565 S.E.2d 407, 410 (2002).[1] With respect to the trial court's denial of the Petitioners' motion for a new trial, this Court explained as follows in syllabus point one of *Andrews v. Reynolds Memorial Hospital, Inc.*, 201 W.Va. 624, 499 S.E.2d 846 (1997):

"Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

With these standards of review as guidance, we proceed to an analysis of the arguments raised in this appeal.

### III. Discussion

■ In syllabus point five of *O'Dell*, this Court explained the appropriate procedure where a prospective juror makes a *clear* statement of disqualifying prejudice or bias, as follows:

Once a prospective juror has made a clear statement during *voir dire* reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent questioning, later retractions, or promises to be fair.

211 W.Va. at 287, 565 S.E.2d at 409. In a scenario in which a prospective juror's statement is *inconclusive or vague*, however, syllabus point four of *O'Dell* explains that "[i]f a prospective juror makes an inconclusive or vague statement during *voir dire* reflecting or indicating the possibility of a disqualifying bias or prejudice, further probing into the facts and background related to such bias or prejudice is required." [2]

■ Guidance for trial courts regarding the specific determination of whether bias or prejudice exists was provided by this Court in syllabus point one of *O'Dell*: " 'Actual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed.' Syllabus Point 5, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996)." Where possible prejudice is demonstrated through initial questioning, further examination of the prospective juror is required. As this Court stated in syllabus point two of *O'Dell*, " '[j]urors who on *voir dire* of the panel indicate possible prejudice should be excused, or should be questioned individually either by the court or by counsel to precisely determine whether they entertain bias or prejudice for or against either party, requiring their excuse.' Syllabus Point 3, *State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978)." [3]

1. While this Court has enunciated several concepts relating to jury selection in criminal matters, we must be mindful that the criminal realm imposes differing standards. See, i.e., State v. Phillips, 194 W.Va. 569, 461 S.E.2d 75 (1995), holding as follows at syllabus point eight:

The language of W. Va.Code, 62–3–3 (1949), grants a defendant the specific right to reserve his or her peremptory challenges until an unbiased jury panel is assembled. Consequently, if a defendant validly challenges a prospective juror for cause and the trial court fails to remove the juror, reversible error results even if a defendant subsequently uses his peremptory challenge to correct the trial court's error. To avoid confusion of the principles, this Court will centralize the discussion in this matter primarily upon cases within the civil context. See also O'Dell, 211 W.Va. at 291–92, 565 S.E.2d at 413–14 (Maynard, dissenting).

2. See also, Syl. Pt. 8, State v. Newcomb, 223 W.Va. 843, 679 S.E.2d 675 (2009).

3. In West Virginia Department of Highways v. Fisher, 170 W.Va. 7, 289 S.E.2d 213 (1982), this Court addressed the methodology to be utilized

■ Subsequent to thorough examination, the trial court must make a decision regarding whether to excuse the juror for bias or prejudice. In syllabus point three of *O'Dell*, this Court explained: "When considering whether to excuse a prospective juror for cause, a trial court is required to consider the totality of the circumstances and grounds relating to a potential request to excuse a prospective juror, to make a full inquiry to examine those circumstances and to resolve any doubts in favor of excusing the juror."

In *Thomas v. Makani*, 218 W.Va. 235, 624 S.E.2d 582 (2005), this Court applied the *O'Dell* standards to a medical malpractice action brought by a patient who alleged that a physician had violated the applicable standard of care. The plaintiff in *Thomas* argued that the trial court had abused its discretion by refusing to strike potential jurors who had received prior successful medical treatment from the defendant physician. This Court, utilizing the standards of *O'Dell*, concluded that the trial court had not erred in failing to strike the juror for cause. Despite the prospective juror's indication that he might possibly "lean toward" believing the testimony of the physician, this Court found that it was "unable to conclude that Juror Evans made a clear statement of disqualifying bias toward Dr. Makani sufficient to disqualify him from serving on the jury." 218 W.Va. at 238, 624 S.E.2d at 585. Although the prospective juror's "initial comments required further inquiry by the court[,]" the subsequent questioning revealed that the prospective juror "would more likely believe the doctor who presented the most credible and convincing evidence." *Id.* at 238, 624 S.E.2d at 585. This Court explained its conclusion as follows in *Thomas*:

> After reviewing the record in this case, we conclude that the trial court took "special care" to determine that Juror Evans was free from bias and prejudice. The trial court clearly considered the totality of the circumstances and conducted a full inquiry before determining that there was no basis to disqualify Juror Evans from serving on the jury.

*Id.* at 239, 624 S.E.2d at 586.

This Court addressed a similar issue regarding challenges for cause in *Macek v. Jones*, 222 W.Va. 702, 671 S.E.2d 707 (2008). The appellants in that case argued that the trial court had erred in failing to strike two prospective jurors for cause. One of the prospective jurors, Mr. George, was allegedly biased in favor of the defendant physician. The *Macek* Court examined the prospective juror's statements, observing as follows:

> Question Number Four, for instance, presented the following question to Mr. George: "Can you state that if, after you have heard all of the evidence in this case, you find that the defendant, Dr. Jones, was negligent, you will return a verdict against Dr. Jones?" Mr. George answered: "If I believe that if his guilt is proven beyond a reasonable doubt, I would probably have no choice." When subsequently asked to explain his answer to that question, Mr. George stated, "Well I—maybe part of my philosophy is I try to be as objective as I can possibly be, because I know that the defendant, you know, he's facing something very serious." He continued, "I tend to be kind of sympathetic with people at the same time and—but there could be a good chance I'd say he's guilty [referring to Dr. Jones] too." Mr. George also explained that he did not "see any difficulties in reaching an impartial and unbiased verdict. . . ."

222 W.Va. at 704, 671 S.E.2d at 709.

Another prospective juror, Mr. Stolburg, allegedly inaccurately explained the degree

---

by a trial court in determining whether removal is necessary, and articulated its reasoning as follows:

> It is not enough if a juror believes that he can be impartial and fair. The court in exercising [its] discretion must find from all of the facts that the juror will be impartial and fair and not be biased consciously or subconsciously. A mere statement by the juror that he will be fair and afford the parties a fair trial becomes less meaningful in light of other testimony and facts which at least suggest the probability of bias. The court in exercising discretion must be convinced that a probability of bias of the juror does not exist. The test of a juror's disqualification is the probability of bias or prejudice as determined by the court.

170 W.Va. at 12–13, 289 S.E.2d at 219 (quoting *Lambert v. Sisters of St. Joseph of Peace*, 277 Or. 223, 560 P.2d 262, 266 (1977)).

to which his employer had investigated medical malpractice issues from a journalistic perspective. Mr. Stolburg was employed as a district sales manager for Ogden Publishing, and that company's coverage of medical malpractice issues had been quite extensive. The appellants consequently argued that Mr. Stolburg had been untruthful when he said he had not read, heard, or discussed anything about medical malpractice litigation. Additional questioning had also revealed that he was aware of Ogden Publishing's coverage of medical malpractice issues and was cognizant of the efforts of physicians in Wheeling, West Virginia, to seek a cap on medical malpractice damages. *Id.* at 705, 671 S.E.2d at 710.

Subsequent to the additional questioning of both challenged jurors in *Macek,* the trial court had exercised its discretion on the issue of striking jurors for cause and had refused to remove the jurors. On appeal, this Court found no abuse of discretion in the trial court's determination and explained as follows:

> Upon this Court's independent examination of the transcript of the voir dire proceedings in this case, we are unable to conclude that either Juror George or Juror Stolburg made a clear statement of disqualifying bias toward Dr. Jones or Weirton Medical Center sufficient to disqualify him from serving on the jury. While we believe that the trial court was correct to conclude that the jurors' initial comments compelled further inquiry by the trial court, we find that such additional questioning revealed that each of these potential jurors was free from disqualifying bias or prejudice. The trial court competently considered the totality of the circumstances and conducted a comprehensive inquiry before determining that the jurors were competent to serve.

*Id.* at 708–709, 671 S.E.2d at 713–714.

In *Sapp v. Morrison Brothers Co.,* 295 S.W.3d 470 (Mo.App.2009), the appellants contended that the trial court had committed reversible error by failing to strike a juror for cause, based upon her statements on the issues of caps on non-monetary damages, frivolous lawsuits, and caps on punitive damages. The *Sapp* court examined the *voir dire* transcript in that case and found no error in the lower court's failure to excuse for cause. Missouri precedent had established that "[a] trial court's ruling on a challenge for cause will be upheld on appeal unless it is clearly against the evidence and is a clear abuse of discretion." *Joy v. Morrison,* 254 S.W.3d 885, 888 (Mo.banc 2008) (quoting *State v. Christeson,* 50 S.W.3d 251, 264 (Mo.banc 2001)). In *Joy,* the relevant inquiry was whether the prospective juror's beliefs had prevented the juror from following the judge's instructions or maintaining an unbiased approach to the evidence to be presented. The *Joy* court had explained that such a determination must not be made in a vacuum or on the basis of a few isolated remarks. Rather, "[a] venireperson's qualifications as a prospective juror are not determined by an answer to a single question, but by the entire examination. The trial court is in the best position to evaluate a venireperson's qualifications to serve as a juror and has broad discretion in making the evaluation." *Joy,* 254 S.W.3d at 888 (quoting *Christeson,* 50 S.W.3d at 264 (internal citations omitted)).

After analyzing the foundations set forth in *Joy,* the *Sapp* court also acknowledged the holding of *Andersen v. Osmon,* 217 S.W.3d 375, 379 (Mo.App.2007), that "[i]f the trial court is convinced that a juror can be fair and impartial after consideration of the entire voir dire examination, then the court is not required to disqualify a juror merely because a certain response, when considered alone, raises the bare possibility of prejudice." 217 S.W.3d at 379. Although the prospective juror in *Sapp* was a registered nurse and had expressed her negative feelings toward the particular plaintiffs' lawyers by whom she had previously been deposed in unrelated cases, she further explained that she could separate those previous negative experiences from her current jury service. She explained her belief that "every profession has someone who makes them look good and someone who makes them look bad." *Sapp,* 295 S.W.3d at 481. Regarding restrictions on lawsuits, she stated that she would listen to the specific details of the case at

trial and would not allow her preconceptions to influence her judgment.

In addressing an argument that the trial court had erred by failing to remove a certain juror for partiality, the court in *Turner v. University of Utah Hospitals*, 271 P.3d 156 (Utah App.2011), analyzed the record from the perspective of the trial court's focus on the appropriate criteria for assessing the impartiality of the prospective juror. During voir dire, the prospective juror had indicated that he had "high regard" for the Huntsman Cancer Center, an institution that was part of the defendant hospital, because he felt that it had provided excellent care to his wife as she struggled with terminal cancer. 271 P.3d at 161. In further questioning, the trial court asked the juror to elaborate upon his reference to the superb care the Huntsman Cancer Center had provided. He responded: "My thought process was I think I could be fair and unbiased but I don't know, you know, if I feel like she got excellent treatment. So I wouldn't be aware of any bias but I don't know if there's any subconscious influence [that] could be there or not." *Id.* When asked whether he could be fair and impartial in the case before him, the prospective juror replied that he "could be fair according to the facts of the case." *Id.*

The trial court in *Turner* denied the challenge for cause based upon the prospective juror's responses, expressions, and intonation. The trial court stated that this prospective juror was attempting to "give us full and complete honest answers." *Id.* On appeal, the *Turner* court concluded that the trial court had appropriately acted within its discretion in ruling that the prospective juror was not biased or impartial.

In evaluating a trial court's refusal to excuse a juror for cause, appellate courts rely heavily upon the transcripts of the questioning of the potential juror. Where a transcript reflects that a trial court and counsel have conducted a reasoned, thorough *voir dire,* appellate courts have been extremely reluctant to find that the trial court committed an abuse of discretion in refusing to strike a juror for cause. In the present case, a measured evaluation of Mr. Helmandollar occurred during *voir dire,* and the trial court

permitted counsel for the Petitioner to examine Mr. Helmandollar and investigate the basis for his statements. Mr. Helmandollar's statements regarding his prior experience with electricity, the allocation of responsibility to determine whether a line is energized, and the obligation to wear insulated gloves were vague and inconclusive as to ultimate bias or prejudice and did not rise to the level of a clear assertion of bias or prejudice. Mr. Helmandollar stated that "[w]e always used the contractors to do that [climbing poles] work." The questioning by Mr. Awadallah, counsel for Hampden, proceeded as follows:

MR. AWADALLAH: Generally, did you hire contractors that you thought were specialists?

PROSPECTIVE JUROR HELMANDOLLAR: Yes.

MR. AWADALLAH: That knew how to work on these electric lines, right?

PROSPECTIVE JUROR HELMANDOLLAR: Yes.

MR. AWADALLAH: Why is that important to you? If it is.

PROSPECTIVE JUROR HELMANDOLLAR: Well, you want someone that—if you're going to contract them out and pay them, you want them to be able to do the job, to know what they're doing.

MR. AWADALLAH: Was it important to you that they did the job safely?

PROSPECTIVE JUROR HELMANDOLLAR: Yes.

MR. AWADALLAH: Have you ever watched them do the work?

PROSPECTIVE JUROR HELMANDOLLAR: Yes, on the trucks, yes.

MR. AWADALLAH: Was any of the work that you watched on energized lines?

PROSPECTIVE JUROR HELMANDOLLAR: No.

MR. AWADALLAH: Why not? Do you know?

PROSPECTIVE JUROR HELMANDOLLAR: It's not safe.

MR. AWADALLAH: So these contractors that you hired came out to work on de-energized lines, right?

PROSPECTIVE JUROR HELMANDOLLAR: Yes.

MR. AWADALLAH: Who actually disconnected the power?

PROSPECTIVE JUROR HELMANDOLLAR: They were responsible for locking and tagging out the power source.

MR. AWADALLAH: Tell me your understanding of locking and tagging out the—that's kind of a specialized term. I assume some of these folks that may have heard it may not understand it, but I'd like to hear your perspective.

PROSPECTIVE JUROR HELMANDOLLAR: Yes, it means if you're going to de-energize a circuit, you want to de-energize the breaker wherever the source is coming from, de-energize it, lock it out with a lock and a tag. The tag usually has the date, the person that's responsible for locking it out and why it's locked out.

MR. AWADALLAH: So when the power's disconnected at a certain point in this line, there's something put on the device to make sure that people don't put it back in, right?

PROSPECTIVE JUROR HELMANDOLLAR: That's correct.

MR. AWADALLAH: Who—you said the contractor and their employees were responsible for doing that, right?

PROSPECTIVE JUROR HELMANDOLLAR: Yes.

MR. AWADALLAH: Because after all, they were the electrical folks.

PROSPECTIVE JUROR HELMANDOLLAR: Yes.

In response to Mr. Helmandollar's initial statements and consistent with the requirements enunciated in *O'Dell*, additional questioning was undertaken. When specifically questioned regarding his ability to maintain an unbiased approach to the significant electrical testimony expected at trial, Mr. Helmandollar stated that he could remain unbiased and open to the evidence to be presented at trial. The additional questioning was conducted by Mr. Segal, counsel for the Petitioners, and proceeded as follows:

MR. SEGAL: Did you say that you had a degree of some type in electrical engineering?

PROSPECTIVE JUROR HELMANDOLLAR: Yes, a degree—bachelor of science in electrical engineering technology.

MR. SEGAL: Okay. And you have worked in that field in the past, of course?

PROSPECTIVE JUROR HELMANDOLLAR: Yes.

MR. SEGAL: Okay. Here's the question: There's going to be testimony in this case by different experts, electrical experts with different backgrounds and training and all that stuff. What I'm concerned about is that we're going to stick you in a situation where you're essentially saying, "Well, I don't agree with that expert because of my own training" or "I agree with this expert because of my own training," and at the same time, we're telling you you have to sit there and put everything aside, you know, it's almost like sticking a doctor in a medical case and saying, "You have to put everything you learning in medical school aside."

And that's why I just wanted to ask you about whether or not we're putting you in an unfair position in this case, saying, "You have to weigh all this testimony about electrical, and you can't use what you learned or what you believe or what you've studied, you've got to listen to the witnesses."

And I didn't want to put you in that situation if it was going to make you uncomfortable.

PROSPECTIVE JUROR HELMANDOLLAR: No, it shouldn't make me uncomfortable, no.

When Mr. Helmandollar was subsequently questioned by Mr. Awadallah, he was asked whether he would "be able to sit on this jury and be a fair juror" and "limit [his] decisions based on what [he would] hear as evidence and the instructions." Mr. Helmandollar responded in the affirmative.

When Mr. Helmandollar initially stated his opinion that the contractors had the responsibility to de-energize the lines, the trial court was only in the *voir dire* stage of these

proceedings. Testimony of the Petitioners' expert had not yet been presented, and the trial court was unaware of the extent to which Mr. Helmandollar's statement might conflict with testimony to be subsequently offered by the Petitioners' expert.[4] With regard to the Petitioners' claims that Mr. Helmandollar's professional education, training, and experience might have unduly influenced the jury, a review of the transcript reveals that Mr. Helmandollar clearly indicated his willingness to disregard his own preconceptions and weigh the evidence fairly.

Furthermore, both parties in this appeal have expressly stated that they do not seek the creation of a specialized rule prohibiting service of certain jurors who have particular expertise, education, or experience in areas to be focused upon during trial, and this Court is disinclined to impose such a rule. Thus, Mr. Helmandollar's education, training, and experience are to be addressed as all other issues in the *voir dire* examination, with reference to whether such matters render him ineligible for service due to bias or prejudice. This is exactly the inquiry undertaken by the trial court in this matter, and this Court finds no basis for a conclusion that the trial court abused its discretion or expressed any doubt concerning Mr. Helmandollar's impartiality and eligibility to serve as a juror.

■ Broad discretion and latitude is to be afforded to the trial court in such matters, and the responsibility lies with the trial judge[5] to make a determination of suitability for service as a juror. "[T]he selection of jurors is a judgment call peculiarly within the province of the circuit judge, and one we will not on appeal second guess in the

absence of a record showing a clear abuse of discretion." *Brown ex rel. Webb v. Blackwood,* 697 So.2d 763, 771 (Miss.1997) (internal quotations omitted). A prospective juror's eligibility to serve is not ordinarily to be determined by an isolated remark or answer to a single question.[6] Rather, when confronted with a challenge for cause, the trial court should base its decision on the entire *voir dire* examination and the totality of the circumstances. The trial court is in the best position to evaluate a prospective juror's qualifications, and the trial court's decision on this issue will be affirmed absent an abuse of discretion.

Mr. Helmandollar did not express any belief or opinion that would indicate an inability to follow the instructions of the trial court and to assess the evidence in a fair and impartial manner. Moreover, in consideration of the totality of the circumstances as well as a thorough examination of the entire *voir dire,* Mr. Helmandollar acknowledged in unequivocal terms that he could perform his duties as a juror without bias or prejudice. There is no indication in this case that Mr. Helmandollar was biased or prejudiced, had predetermined the outcome of the case, or was otherwise ineligible for service. He specifically indicated that his personal experiences would not prevent him from rendering an impartial verdict, and he affirmatively stated that he would serve as an impartial juror despite his personal history.

The trial court was in the optimal position to determine whether any opinions Mr. Helmandollar may have expressed during *voir dire* warranted his removal from the jury for cause or whether his personal electrical expe-

---

4. Mr. Helmandollar stated during *voir dire* that contractors would have the responsibility to de-energize the lines. Mr. Helmandollar's statement did not entirely conflict with the opinions which were subsequently expressed in the testimony of the Petitioners' expert, Mr. Bybee. In such expert testimony, Mr. Bybee was asked whether, "regardless of what Hampden Coal did or didn't tell" Rectron about de-energizing the lines, the leadership at Rectron still had the responsibility to make sure the lines were checked. Mr. Bybee answered in the affirmative.

5. "It is not for the juror to decide whether he can render a verdict solely on the evidence. The discretion to decide whether a prospective juror can render a verdict solely on the evidence is an issue for the trial judge to resolve." *O'Dell,* 211 W.Va. at 289, 565 S.E.2d at 411.

6. There are obviously instances in which a prospective juror's isolated remark might be so egregious as to warrant removal from the jury, such as a statement of hatred or animosity toward a particular party, attorney, or other entity central to the trial of the case at issue.

rience, training, and education would have rendered him ineligible for jury service in this particular case. Given the deferential standard of review to be applied to such issues and the circumstances as examined herein, this Court finds that the trial court's decision to deny the Petitioners' motion to excuse Mr. Helmandollar for cause did not constitute an abuse of discretion. Consequently, we find no error in the trial court's denial of the Petitioners' motion for a new trial, and we affirm the trial court.

Affirmed.

Justice DAVIS is disqualified.