IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Rebecca Black, | ) | OPINION |
| | ) | |
| Petitioner and Appellant, | ) | Case No. 20100597-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (September 20, 2012) |
| O. Holger Hennig, | ) | |
| | ) | 2012 UT App 259 |
| Respondent and Appellee. | ) | |

-----

Third District, Salt Lake Department, 054905905
The Honorable Denise P. Lindberg

Attorneys:    David S. Pace, Cottonwood Heights, for Appellant
              Melissa M. Bean, Salt Lake City; and Martin N. Olsen, Midvale, for
              Appellee

-----

Before Judges Orme, Davis, and Thorne.

THORNE, Judge:

¶1      Petitioner Rebecca Black appeals from the district court's Findings of Fact,
Conclusions of Law, Amended Joint Parenting Plan, and Decree of Paternity, Child
Support, and Parenting Time and the court's Ruling on Cross-Motions to Strike.  We
affirm in part, and reverse and remand in part.


BACKGROUND

¶2      Black met O. Holger Hennig in 1999.  In September of that same year, the parties
became roommates when Hennig moved into Black's home.  They entered into a

domestic relationship with one another around Thanksgiving. In 2003, Hennig purchased a home and Black moved in with him. Sometime in 2003, Hennig proposed marriage, and the parties set a wedding date, which was later either postponed or canceled. The parties have two sons together, A.B., born in Utah on April 17, 2004, and O.B., born in Oregon on April 8, 2006.

¶3 On October 25, 2005, Black filed a petition for paternity requesting a declaration of paternity, child support, and sole custody of A.B. in the Third District Court (district court or court). In December, Hennig filed an answer and counter petition seeking joint legal and physical custody of A.B. That same month, Black informed Hennig of her intention to relocate to Oregon with A.B. in early 2006. Hennig filed a motion for a temporary restraining order (TRO), seeking to prevent Black from relocating. On December 8, the district court conducted a hearing on the TRO and denied Hennig's motion for a TRO restraining Black from leaving Utah with the parties' minor child. Instead, the court scheduled the matter for a preliminary injunction. Ultimately, the court denied Hennig's injunction request.

¶4 In February 2006, the district court held a hearing on an order to show cause motion Black had filed and Hennig's motion for temporary orders. The court awarded temporary custody of A.B. to Black and ordered Hennig to be responsible for any travel expenses flowing from his exercise of parent-time with the parties' minor child. In June, Black filed a first amended petition for custody, visitation, and child support. In that petition, Black stated that she "intends to file a paternity/custody action in the state of Oregon, [O.B.'s] home state, to establish a paternity, custody and parent-time order pertaining to [O.B.]." Black included in her first amended petition a request that the court require Hennig to maintain medical insurance and pay child support to Black for both of the parties' children. In July, Black filed a separate petition to establish paternity in the Oregon Circuit Court (Oregon court) requesting a declaration of paternity, child support, and sole custody of O.B. In August, Black filed a petition requesting that the Oregon court render a judicial determination of jurisdiction in the matter. The Oregon court held a hearing and declined to exercise jurisdiction under the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA). *See generally* Or. Rev. Stat. §§ 109.701 to 109.834 (1999) (adopting the UCCJEA).

¶5 The district court commissioner ultimately certified the case for trial on the issues of custody of the parties' minor children, Hennig's request for a retroactive adjustment

to the child support order,[1] and Hennig's contempt.[2]  The parties stipulated that the issue of attorney fees would also be presented at trial for decision.  In addition, the court considered the pretrial issue as to whether the children's surnames should be legally changed to Black-Hennig.[3]  Beginning in July 2009, the district court held a four-day bench trial.  After three days of trial, Black moved to strike the report and testimony of Dr. Valerie Hale, the clinical psychologist who conducted the custody evaluation.  Black alleged that (1) Dr. Hale had engaged in extensive ex parte communication with Hennig's attorneys, thereby compromising her role as an agent of the court and casting doubt on the impartiality of her recommendations; (2) Dr. Hale's methodology was flawed and improper;[4] (3) the report was incomplete and conclusory and intended for an improper purpose;[5] and (4) Dr. Hale inappropriately relied on the work and opinions

---

1.  During the course of the case, Black made several requests for an increase in child support.  In February 2008, the district court ruled that the amount of child support was temporary and may be adjusted at trial.  Thereafter, Black requested that if an increase in child support is allowed, that it be made retroactive to the time of Black's prior requests.

2.  Various issues of contempt were certified for trial including whether Hennig violated court orders to provide his work schedule and proof of life insurance coverage as well as the court's prohibition against disparagement of the other party.  Also considered at trial but not certified by the commissioner was the issue of whether Hennig violated the court's order that neither party have overnight guests of the opposite sex while the children were present.

3.  It appears from our review of the record that Black presented this issue in a pretrial motion that the court did not rule on before trial.  The parties did not stipulate to having the issue addressed at trial, the issue was not certified for trial, nor does it appear that the issue was argued.  However, evidence pertaining to the surname issue was presented and the court ruled on the issue without objection from the parties.

4.  Black argued that Dr. Hale (1) did not sufficiently investigate significant events and behavior of the parties, (2) did not adequately consider child care issues, and (3) did not give both parties the same opportunities to participate in the evaluation process.

5.  Black argued that Dr. Hale's report was flawed because she did not make critical findings and recommendations and made unsupported statements.  Black also argued

(continued...)

20100597-CA                                   3

of another psychologist.[6] The district court reviewed the parties' submissions on the matter and denied Black's motion. The court determined that Dr. Hale was not a court official and had not violated prohibitions on ex parte communications or professional standards of practice. The court further determined that Dr. Hale's methodology in producing her custody evaluation was neither flawed nor improper.

¶6 At the conclusion of the hearing, the district court ordered joint legal and joint physical custody of the parties' minor children. The court's provisions pertaining to the parent-time schedule and physical custody arrangement are as follows:

> 5. The parties shall share joint legal and joint physical custody of the children. They shall cooperate in filing a Parenting Plan that is consistent with the Decree and Utah Code [section] 30-3-10.9. The Plan shall expressly provide for dispute resolution mechanisms before enforcement or modification is sought from the Court, except in emergency situations requiring ex parte orders to protect the children. The actual parent-time schedule shall depend on whether or not one of the parties relocates. Neither parent shall be able to exclude the other from full participation in the children's lives.
>
> 6. The exact structure of the physical custody arrangement shall depend on whether or not one of the parties relocates. It shall be of paramount importance in this case that the parties be given a clearly defined parent-time

---

5. (...continued)
that Dr. Hale violated the purpose of her role as an independent custody evaluator when she impermissibly attempted to use her report to coerce the parties to settle.

6. Black argued that Dr. Hale abdicated her duties as a court appointed evaluator by substituting the professional judgment and opinions of Dr. Thomas Deschler for her own. Dr. Hale testified that Dr. Deschler is the psychologist that Black initially contacted to opine about visitation issues. Dr. Deschler apparently changed roles and became the children's therapist.

schedule so that there is little room for interference or dispute.

7. To bring a reasonable degree of finality to these proceedings, any parental relocation shall need to take place, if at all, within six (6) months of the issuance of the Decree of Paternity, Parent-time and Support (the "Decree") in this case. The relocating party shall provide prompt notice to the Court of his/her intent to do so. In the event both parties should file notices of intent, the first in time shall receive the designation as the children's "primary" custodial parent designation. If no relocation has been accomplished within the designated period, the Court shall implement a default, non-relocation parent-time schedule more fully described below.

8. . . . . The relocating party's home shall be designated as the children's primary residence . . . .

. . . .

10. In the event there is no relocation as defined here, [Black] shall *initially* remain the primary custodial parent but [Hennig's] parent time shall be substantially increased to achieve parity with [Black]. . . .

(Footnotes omitted.) The court further determined that Hennig is the biological and legal father of the children and is "entitled to have the children carry his surname," and the court ordered that the children's birth certificates shall be legally changed to show their surnames as "Black-Hennig."

¶7 The district court declined to award Black her attorney fees. The court also declined to award Hennig his attorney fees except for those related to Black's

bad faith efforts to take this case before the Oregon courts when she was fully aware that Utah had ongoing jurisdiction which merits having a judgment entered for [Hennig] in the amount of $7,000 to make him whole for the

> expenses [Black] forced [him] to incur to defend in that
> action.

Black appeals.


## ISSUES AND STANDARDS OF REVIEW

¶8      Black argues that the district court erred by failing to admit evidence pertaining to an allegation of bias resulting from an alleged personal friendship between Dr. Hale and one of Hennig's attorneys.  "We review a trial court's decision to admit or exclude evidence for an abuse of discretion."  *Turner v. University of Utah Hosps.*, 2011 UT App 431, ¶ 6, 271 P.3d 156, *cert. granted*, 280 P.3d 421 (Utah 2012).

¶9      Black next argues that the court erred by failing to strike Dr. Hale's testimony.  "The trial court has wide discretion in determining the admissibility of expert testimony. . . ."  *Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 5, 242 P.3d 762 (internal quotation marks omitted).

¶10     Black also asserts that the district court erred by failing to give the appropriate weight to Black's primary caregiver status when it made its child custody determination and additionally by failing to make the requisite specific findings detailing the weight the court gave to the primary caregiver status and the stability of the children.  We review custody determinations under an abuse of discretion standard, *see Hudema v. Carpenter*, 1999 UT App 290, ¶ 21, 989 P.2d 491, giving the district court broad discretion to make an initial custody award, *see Carsten v. Carsten*, 2007 UT App 174, ¶ 3, 164 P.3d 429 (mem.).

¶11     Black further asserts that the court erred by ordering that the children's surnames be changed to Black-Hennig without considering the impact the name change would have on the children.  "[T]he task of determining the best interests of the child in a [case involving a child's surname] is for the trial judge, who has the opportunity to personally observe and evaluate the witnesses."  *Christensen v. Christensen*, 941 P.2d 622, 624 (Utah Ct. App. 1997) (second alteration in original) (internal quotation marks omitted).  "We review the trial court's findings under a clearly erroneous standard and will not disturb those findings unless they are against the clear weight of the evidence,

or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *Hamby v. Jacobson*, 769 P.2d 273, 279 (Utah Ct. App. 1989).

¶12    Regarding attorney fees, Black argues that the district court erred in failing to award Black her attorney fees and instead awarding Hennig $7,000.  "[T]he decision to grant or deny attorney fees is within the trial court's sound discretion."  *Davis v. Davis*, 2003 UT App 282, ¶ 9, 76 P.3d 716 (alteration in original) (internal quotation marks omitted).  Black maintains that the court erred when finding that Black's filings in the Oregon court were made in bad faith.  We review findings of bad faith for abuse of discretion.  *See Jeschke v. Willis*, 811 P.2d 202, 204 (Utah Ct. App. 1991).


ANALYSIS

I.  Exclusion of Evidence

¶13    Black first argues that the district court erred by not allowing her to admit Facebook screenshots at trial,[7] which evidence Black asserts would establish that Dr. Hale and one of Hennig's attorneys had a friendship that, if established, would cast doubt on the impartiality of Dr. Hale's recommendations.  The district court determined that the Facebook evidence was extrinsic evidence offered to attack Dr. Hale's truthfulness and prohibited its admission under Utah Rule of Evidence 608(b).  "We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Turner v. University of Utah Hosps.*, 2011 UT App 431, ¶ 6, 271 P.3d 156, *cert. granted*, 280 P.3d 421 (Utah 2012).

¶14    During the trial, Black's attorney asked Dr. Hale, "Isn't it true that you have a relationship that may be somewhat more involved with one of the attorneys in this matter?"  Dr. Hale responded that she knew Martin Olsen, one of Hennig's attorneys better than Black's attorney.  Thereafter, Black's attorney asked whether Dr. Hale had been shopping together within the past month with Melissa Bean, another of Hennig's attorneys (Hennig's attorney).  Dr. Hale responded that she had not shopped with Hennig's attorney but had talked to her on Facebook about places to shop for clothes.  Black's attorney then sought to introduce screenshots from Dr. Hale's Facebook page

---

7. Facebook is a social networking website.  A screenshot is a copy or image of what appears on a computer screen at a particular point in time.

asserting that such evidence "went to bias and objectivity."[8] The court denied admission of the evidence under Utah Rule of Evidence 608(b), finding that Black's attorney had asked Dr. Hale a question about a specific instance of conduct, had received an answer, and was seeking to introduce extrinsic evidence to attack the witness's truthfulness and credibility. Rule 608 of the Utah Rules of Evidence provides in pertinent part:

> (b) *Specific instances of conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
>
> . . . .
>
> (c) *Evidence of bias. Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced.*

Utah R. Evid. 608(b)–(c) (third emphasis added).

¶15  We observe that the specific instance of conduct at issue in this case, was not, as the district found, being offered as an attack on the truthfulness or untruthfulness of Dr. Hale regarding whether she had shopped with Hennig's attorney. Rather, the Facebook

---

8. In her Memorandum in Support of Petitioner's Motion to Strike the Report and Testimony of Dr. Valerie Hale and Motion for Reconsideration, Black asserted that the Facebook screenshots show that Dr. Hale and Hennig's attorney became friends and carried on a regular and personal correspondence before and during the trial in this matter. The record does not contain a copy of the Facebook screenshots offered into evidence.

screenshots were offered as evidence in an attempt to demonstrate that Dr. Hale and Hennig's attorney frequently contacted one another and that they had a long-standing friendship, which friendship, if established, would demonstrate bias or a motive to testify differently than would otherwise be the case. Extrinsic evidence pertaining to a prior instance of conduct is, however, admissible to show a witness's bias or motive to testify and is not subject to exclusion under rule 608(b). *See State v. Hackford*, 737 P.2d 200, 203 (Utah 1987) (citing cases under the identical federal rule 608 "support[ing] the view that 608(b) does not deal with the proper scope of examination for bias" and noting that Utah Rule of Evidence 608(c) explicitly allows evidence of specific conduct to be admitted to show bias, prejudice, or any motive to misrepresent); *see also* Utah R. Evid. 608(c). "[I]f a prior instance of conduct is relevant to a witness'[s] bias or motive to testify differently than would otherwise be the case, evidence pertaining to that conduct is not subject to exclusion under Rule 608(b)." *Hackford*, 737 P.2d at 203. In this case, Black sought to admit the Facebook screenshot evidence to demonstrate bias and not for the truthfulness or untruthfulness of Dr. Hale's testimony that she had not shopped with Hennig's attorney. Therefore, we conclude that rule 608(b) is not applicable and the Facebook evidence should have been admitted under rule 608(c).

¶16     In circumstances, such as in this case, where we determine that evidence should have been admitted, we would normally consider whether that error is harmless. *See State v. Colwell*, 2000 UT 8, ¶ 26, 994 P.2d 177. However, the record before us neither contains a copy of the Facebook screenshots offered into evidence, *see supra* note 8, nor did Black proffer its contents. That lack of an adequate record prevents us from undertaking a meaningful harmless error analysis, *cf. State v. King*, 2010 UT App 396, ¶ 43, 248 P.3d 984, and no appellate relief is available, *see State v. Lindgren*, 910 P.2d 1268, 1271 (Utah Ct. App. 1996) ("[E]ven if we conclude the trial court's decision regarding admissibility was error, we will not reverse unless the error was harmful[.]").

II.  Motion to Strike Dr. Hale's Testimony

¶17     Black next argues that the district court erred by denying her motion to strike Dr. Hale's testimony. Black asserts that the court should have granted her motion to strike because (1) Black was not allowed to introduce evidence of a personal friendship between Dr. Hale and Hennig's attorney,[9] (2) Dr. Hale engaged in improper conduct

---

9. In the previous section, we determined that although the district court should have

(continued...)

that violated the Association of Family and Conciliation Courts (AFCC) model standards and compromised her professional integrity thereby invalidating her recommendations to the court, and (3) Dr. Hale's methodology was flawed and improper.

A. The AFCC Model Standards

¶18    Black argues that Dr. Hale violated the AFCC model standards when she conducted three substantive ex parte communications with Hennig's attorney in preparation for trial,[10] and then did not make public her most important recommendations until trial.

¶19    Black first asserts that Dr. Hale violated the AFCC model standards when she met with Hennig's attorney prior to trial because the model standards indicate that ex parte communications between child custody evaluators and the parties' attorneys are prohibited.[11]  Black also asserts that the AFCC model standards go further and direct that evaluators shall take reasonable steps to avoid relationships with people being either evaluated or involved in such evaluations.

---

9.  (...continued)

admitted the evidence Black sought to introduce at trial to demonstrate the personal friendship between Dr. Hale and Hennig's attorney, we were unable to review the error for harmless error based on lack of adequate record.  Likewise, we cannot consider whether the alleged friendship warranted the district court's granting of Black's motion to strike.

10.  Two of the meetings occurred at the home of Hennig's attorney.  The other meeting took place at the courthouse.

11.  The AFCC model standards do not state that communications between the evaluator and the parties' attorneys is strictly or entirely prohibited, rather it provides that those individuals shall not have *substantive communications* about the case with the evaluator.  *See* AFCC Model Standards of Practice for Child Custody Evaluation § 4.4 (2006) ("Child custody evaluators shall not have substantive ex parte communications about a case with the Court or with the attorney's [sic] representing the parties.").

¶20 The district court considered the AFCC model standards and found that Dr. Hale did not "violate[] or disregard[] either the [American Psychological Association] standards or the AFCC guidelines." The court noted that Dr. Hale, during her testimony, endorsed the non-binding AFCC guidelines and stated that, as a general proposition, Dr. Hale incorporates those guidelines in her practice as appropriate to the case. Black does not challenge on appeal the court's conclusions that the AFCC model standards are merely guidelines which Dr. Hale followed and that the trial preparation with Hennig's counsel did not compromise her collection and interpretation of the data used for the report.[12] Because Black fails to assert any error with the court's findings that the AFCC model standards are merely guidelines that Dr. Hale incorporated into her practice, we find no error with the court's conclusion that Dr. Hale did not violate or disregard the AFCC guidelines.

¶21 Black next argues that Dr. Hale violated the AFCC model standards when she deliberately withheld her custody recommendation from her report. The district court found that "Dr. Hale's reasoning and conclusions were known to the parties at the time they stipulated to the admissibility of Dr. Hale's report." The court was not persuaded by Black's argument that Dr. Hale improperly withheld her "'ultimate conclusion'" regarding the children's custody status, based on Dr. Hale's testimony that "it was not unusual for custody evaluators simply to provide the Court with data on which the Court could make its findings, without specifically making recommendations on the ultimate issue of who should have custody." The court also referred to Dr. Hale's testimony, explaining that she "did not include [a custody] recommendation because she had been informed that [Hennig] was exploring relocation to Oregon, [and therefore,] the question was not before [her] at that point." (Internal quotation marks omitted.) The court accepted Dr. Hale's explanation as to why she did not include recommendations in her report on the ultimate custody issue and rejected Black's suggestion that Dr. Hale's work was incomplete and her actions were intended to mislead. The district court made findings in support of its conclusion that Dr. Hale did not improperly withhold her ultimate conclusion or mislead the parties, stating:

> At trial, all parties had the opportunity to examine Dr. Hale, but even after extensive direct and cross-examination,

---

12. The district court noted that Black did "not dispute that, as a matter of contract, her counsel had equal opportunity to meet with Dr. Hale for trial preparation, but chose not do so."

neither party raised the issue [about Dr. Hale's ultimate conclusion] directly. Rather, it was the Court that pressed Dr. Hale on this point. Only then did Dr. Hale reluctantly express[] her opinion. After giving her opinion Dr. Hale explained her reasons for not reaching this issue as a formal recommendation to the Court. The Court finds that Dr. Hale's recommendation on this issue is wholly consistent with the totality of her findings and recommendations as reflected in her report.

¶22    On appeal, Black does not challenge the district court's findings supporting its conclusion that Dr. Hale did not improperly withhold her ultimate conclusion and that Dr. Hale's recommendation was consistent with the findings and recommendations in her report. Instead, Black again asserts that Dr. Hale's ex parte contact with Hennig's attorney was improper conduct that influenced her testimony and that Dr. Hale should not have been allowed to exceed the scope of her report in her testimony at the trial in this matter. Because Black does not challenge the district court's findings in support of its conclusion that Dr. Hale did not improperly withhold her ultimate conclusion, mislead the parties, nor exceed the scope of her report, we decline to disturb the district court's discretion.

B.  Dr. Hale's Custody Evaluation Methodology

¶23    Black argues that Dr. Hale's methodology was flawed, improper, shows shortcomings in her analysis, evidences bias, and a failure to investigate critical concerns in preparing her evaluation. The district court, however, found that Dr. Hale's methodology in producing her custody evaluation report was neither flawed nor improper. The court explained that it

> fundamentally disagrees with [Black's] contentions that Dr. Hale did not sufficiently investigate critical concerns, that her methodology was flawed, or that the report was "unbalanced" or "conclusory." Once the report was prepared and submitted, all the parties stood on equal footing to evaluate the methodology employed. [Black] could have, in advance of trial, challenged the specifics related to the evaluation's methodology and asked Dr. Hale for clarification or for further consideration of other facts by

way of an addendum to the report. [Black] did not pursue any of those options, but instead stipulated to the report's admissibility. The fact that [Black] disagrees with the data reported by Dr. Hale, and her recommendations, is not a sufficient basis for disallowing the report or striking the testimony.

Finally, the Court has considered the balance of [Black's] contentions and finds them to be without merit.

Black fails to dispute the district court's finding that Black did not challenge the specifics related to Dr. Hale's evaluation methodology and instead stipulated to the report's admissibility.

¶24    Because Black does not challenge any of the pertinent findings concerning the district court's decision to deny Black's motion to strike Dr. Hale's report and testimony, we conclude that the court did not err when it denied Black's motion to strike.

III.  Primary Caregiver Status

¶25    Black next argues that the district court erred when it awarded joint legal and physical custody of A.B. and O.B. to the parties. Black asserts that the court erred by failing to adequately consider Black's status as the primary caregiver and failing to make the requisite specific findings to detail the weight given to the primary caregiver and the stability of the children.[13]

---

13.  To the extent that Black argues that the district court failed to make the requisite specific findings to detail the weight given to the factors concerning primary caregiver and the stability of the children, we decline to consider this issue based on lack of preservation. *See generally Connell v. Connell*, 2010 UT App 139, ¶¶ 24–25, 233 P.3d 836. It does not appear that Black requested that the court consider and make such findings. Black argues neither plain error nor exceptional circumstances in her brief on appeal. *See generally 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶¶ 50–52, 99 P.3d 801. Thus, we do not address this issue.

20100597-CA                          13

¶26    "When assessing whether a custody change is in the best interests of a child, the trial court looks to many factors." *Hudema v. Carpenter*, 1999 UT App 290, ¶ 25, 989 P.2d 491. "Generally, it is within the trial court's discretion to determine, based on the facts before it and within the confines set by the appellate courts, where a particular factor falls within the spectrum of relative importance and to accord each factor its appropriate weight." *Id.* ¶ 26. "This court gives considerable discretion to the trial court in making custody decisions, unless it appears that the trial court has given short shrift to the statutory criteria." *Sigg v. Sigg*, 905 P.2d 908, 916 (Utah Ct. App. 1995) (internal quotation marks omitted). "A trial court's findings of fact should reflect that the court considered stability as a factor in the custody decision and the weight the court accorded it." *Id.* (internal quotation marks omitted). "[A] lengthy custody arrangement in which a child has thrived ought rarely, if at all, to be disturbed, and then only if the circumstances are compelling." *Id.* (internal quotation marks omitted).

¶27    In this case, the district court received and took into account an extensive amount of information during the four-day trial about the best interests of the children, including considerable evidence pertaining to Black's primary caregiver status—the custody arrangement in place at the time of trial, and the children's need for stability in the custodial relationship. The court heard testimony from the parties, witnesses for both parties, and the custody evaluator, which witness testimony collectively included many factors pertaining to the children's best interests.

¶28    Notably, Dr. Hale, the custody evaluator, provided extensive testimony during the trial about the previous custodial arrangement with Black and the best interests of the children. Dr. Hale testified as follows:

> Q. [W]here do you believe the best interests of [O.B.] and [A.B.] lie?
>
> A. I think their long-term emotional viability, it has to be with their dad. I don't—I didn't make that recommendation. I didn't want to. I was hoping you wouldn't ask it.
>
> THE COURT: If he hadn't I would have.
>
> THE WITNESS: Okay, thank you, Your Honor. Because the physical care issues are so great that I think

these children are in huge emotional danger . . . . Obviously it's much more difficult to argue from an evaluator's prospective [sic] (inaudible) custodial mom, she has great skills, she's careful, she's pleasant to me, anyway. She's, gosh, there's evidence piled up to the sky from the nets around the bar between, on the stairs, landing on the stairs, those nets that were placed there to her worrying herself to pieces about, you know, preschool and what's the right one. You know, it's a hard recommendation to make and you have to sit with the case a long time but I think that—I don't see any hope in changing although I haven't spoken to [Black] in a while, maybe she's calmed and different and able to be rational and if that's the case,[14] that's up to the Court to discover. But for me, I don't have any data that supports change. I don't see her entering into psychotherapy post-settlement conference . . . . I did see [Hennig] with interviews and stuff scheduled to go up there. I didn't see anything from [Black] personally that makes me think anything is going to change and if [it] doesn't, [the children] won't have their dad and I think it will ruin them for their whole life. I just can't, I can't recommend otherwise but I don't like it.

---

14. Dr. Hale, in her report, described Black as anxious and controlling, which "anxiety is out of control and needs to be managed or she will continue to neglect the boys' real emotional needs." Dr. Hale further noted that Black

loves the children and tries to do her best by them and succeeds in many ways. She is (inordinately at times) worried about their safety, keeps a safe and cheerful home environment, researches exhaustively the best learning environments for them, makes sure they have opportunities for play with their cousins, takes them for long walks, reads to them, and is proud of them . . . . She wants only the best for them . . . . It is tragic that these lovely aspects of [Black's] parenting are damped down by her anxiety, by her need for control, and by her hostility [toward Hennig].

¶29   Additionally, Dr. Hale provided the court with a thirty-five page child custody evaluation report.[15]  In her report, Dr. Hale provided detailed information concerning the temporary custody arrangement with Black and addressed the factors enunciated in the uniform custody evaluation guidelines provided in rule 4-903 of the Utah Code of Judicial Administration,[16] *see* Utah Code Jud. Admin. 4-903.  In particular, Dr. Hale addressed "the general interest in continuing previously determined custody arrangements where the child is happy and well adjusted," *id*. R. 4-903(5)(D).  Dr. Hale addressed this factor by first noting various positive aspects of the previous custody arrangement with Black.[17]  Dr. Hale, however, also noted that Black helped to create and maintain an extremely negative response to Hennig within the home and family in Oregon.  Further, Dr. Hale opined that

> [o]nly the children's young age has protected them from the derision and contempt that their loved mother and grandparents have for their father.  If the children remain in Oregon in a sole custody situation with their mother, it is likely that they will begin to hold a polarized view of their father in the face of the rest of their family's intense dislike of him, in order to remain "in good standing" with these relatives whom they love, especially their mother.  Contact with their father would go a long way in counteracting these negative messages about him.

Dr. Hale concluded that the children need both parents in their lives on a regular basis. Dr. Hale recommended that if parental relocation occurred, the court should grant the parties joint physical and legal custody.  When asked for her recommendation in the event that neither party relocated, Dr. Hale reluctantly recommended sole physical

---

15.  Dr. Hale submitted her report to the district court on June 11, 2009.

16.  The district court specifically adopted Dr. Hale's analysis of the uniform custody evaluation guidelines factors as its own and incorporated it in the court's January 20, 2010 order.

17.  Dr. Hale noted that Black meets the children's physical needs very well, is devoted to finding the best academic placement for them, and supports the children's relationship with cousins, maternal grandparents, and other extended family in Oregon.

custody of the children be awarded to Hennig to ensure that the children have a relationship with him.

¶30    The district court incorporated Dr. Hale's evaluation and testimony by reference in its Findings of Fact, Conclusions of Law, and Order, specifically stating that "both [Dr. Hale's] Report and the testimony have been given serious consideration and weight by the Court." The court found that "Dr. Hale thoroughly and appropriately assessed and presented the children's needs as well as the strengths and weaknesses of the parties." The court further found that Black "is not invested in fundamentally changing her attitudes or behavior to better accommodate [Hennig's] relationship with the children."[18]  Thereafter, the court found that Dr. Hale's custody recommendation, in the event one of the parties does not relocate to be nearby one another, for sole physical custody of the children with Hennig created several problems including issues pertaining to the previous custodial arrangement and stability of the children. The court noted that it "also faces the very real limitations posed by [O.B's] young age, the fact that [Black] has been [O.B.'s] principal care giver since birth, and the fact that it has only been in the last year that [Hennig] has had even limited 'overnight' time with [O.B.]." The court further found, that before it could consider the possibility of sole physical custody with Hennig, the relationship with the children needed to be strengthened. Therefore, the court found "that it is in the children's best interest for the parties to share joint legal and joint physical custody of the children." Based on the court's consideration of Dr. Hale's report and testimony that focused extensively on the stability factor and the court's very thorough order containing over 142 findings of fact, we conclude that the district court was acting within the proper bounds of its broad discretion in awarding joint legal and joint physical custody to the parties.

IV.  Children's Surname

¶31    Black argues that the district court erred by granting Hennig's request to change the children's surnames without determining and making the appropriate statutory findings regarding whether a name change was in the children's best interest. Hennig responds that Black failed to preserve this issue below. Black contends that the issue is

---

18.  As an example, the court cited Black's response to the following question on cross-examination "what she would do to facilitate [Hennig's] parent-time." "[Black's] only response [was] 'Skype' and 'mail.'"

preserved because her counsel filed Black's affidavit, in response to Hennig's amended motion for parent-time agreement and custody evaluation and name change, wherein Black specifically asserted that the name change would adversely affect the children.[19]

¶32    "[I]n order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Connell v. Connell*, 2010 UT App 139, ¶ 24, 233 P.3d 836 (alteration in original).  The district court found that "[Hennig] testified (without challenge by [Black]) that he had no input in selecting the children's names or in the decision that the children would carry only [Black's] surname.  [Hennig] has petitioned to have the children's birth certificates amended to include his surname."  The court ruled that "the children's birth certificates shall be legally changed to show their surnames as 'Black-Hennig.'"  Upon learning of the court's name change ruling, Black did not request that the court consider and make findings regarding whether a name change was in the children's best interest.  Therefore, we determine that Black did not preserve this issue.  *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 ("[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." (alterations in original) (internal quotation marks omitted)).  "Under ordinary circumstances, we will not consider an issue brought for the first time on appeal unless the trial court committed plain error or exceptional circumstances exist."  *RJW Media, Inc. v. CIT Grp./Consumer Fin., Inc.*, 2008 UT App 476, ¶ 24 n.3, 202 P.3d 291 (internal quotation marks omitted).  Black argues neither plain error nor exceptional circumstances in her brief on appeal, we therefore do not address her name change issue further.  *See State v. Weaver*, 2005 UT 49, ¶ 2, 122 P.3d 566.

## V.  Attorney Fees

### A.  Attorney Fees in the Custody Proceeding

¶33    Black raises several arguments pertaining to the district court's attorney fees determination.  "[T]he decision to grant or deny attorney fees is within the trial court's sound discretion."  *Davis v. Davis*, 2003 UT App 282, ¶ 9, 76 P.3d 716 (alteration in original) (internal quotation marks omitted).

---

19. We note that the affidavit was filed on October 31, 2006, almost three years before the custody trial.

¶34    The district court, in making its attorney fees determination, found

> 113.  Both parties have asked for attorney's fees in this matter.  [Black] bases her request on her alleged need for assistance and [Hennig's] financial ability to assist her with those costs.  For his part, [Hennig] seeks attorney's fees because [Black's] actions have caused him to incur excessive attorney's fees to enforce his parent-time (*e.g.*, petitioning the Oregon courts to take jurisdiction of this case; denying [Hennig] parent time, etc.).

> 114.  According to [Black], she has incurred attorney's fees and court costs [up to the time of trial, in the amount of $140,702.76] . . . .

> 115.  [Black] also asks that [Hennig] pay and hold her harmless for [$3,467.17 in litigation expenses] . . . .

> 116.  [Black] testified that she's had to borrow approximately $34,000 from her father to pay attorney's fees.

> 117.  In her Financial Declaration . . . [Black] indicates that her gross monthly pay is $5,915.  However, the Court has found that [Black] should be imputed income of $119,454.40 annually or $9,955 monthly.  [Black's] Declaration also fails to credit, as additional income, the $1,400 per month in child support that she has been receiving since it was ordered in March 2007.

> 118.  [Black] claims monthly expenses of $8,412.  However, the Court has reviewed [Black's] monthly expenses and finds that at least some of the claimed expenses are substantially overstated.  After imputing full-time wages to [Black], adjusting her excessive claimed expenses to more reasonable levels, and crediting as additional income the child support payments she receives,

the Court finds that [Black] can pay her own attorney's fees without contribution by [Hennig].

119. The Court further finds that [Black's] own actions significantly prolonged the case and increased each side's attorney fees. In particular, [Black's] attempt to forum-shop the case, her unwillingness to cooperate in designing a reasonable parent-time schedule, and her other efforts to frustrate [Hennig's] legitimate interest in being an on-going and active presence in the children's lives, required [Hennig] to litigate matters that really shouldn't have needed to be litigated. [Black's] largely unwarranted disputes with the [Guardian Ad Litem (GAL)] also resulted in increased costs all around. Even after the Court attempted to [rein] in the costs by ordering each side to bear a proportional share of "extra legal" expenses (*i.e.*, the costs associated with the mediator, the parent coordinator, the custody evaluator, and the GAL), [Black] refused to follow through with her share of those financial obligations . . . .

120. As acknowledged by [Black] herself, . . . "The Court imposed on [Hennig] the burden of the majority of the litigation expenses." Indeed, [Hennig's] counsel represented —to the Court—without challenge by [Black]—that in the course of this litigation (and in additional to his own attorney's fees) [Hennig] has paid approximately $45,000 to the two GAL[s]; $2,500 to Dr. Davies, the parent coordinator; $14,000 to Dr. Hale, the custody evaluator; and over $40,000 in travel costs in order [to] have parent-time with the children.

121. Based on the foregoing, and except as discussed below, the Court finds that [Black] should bear her own attorney's fees and other litigation expenses . . . .

(Footnotes and citation omitted.) The district court concluded that Black's

20100597-CA                          20

bad faith efforts to take this case before the Oregon courts
when she was fully aware that Utah had ongoing
jurisdiction over the case merits having Judgment entered
for [Hennig] in the amount of $7,000 to make him whole for
the expenses [Black] forced [Hennig] to incur to defend in
that action . . . .

¶35    Black first argues that the district court erred by failing to award her attorney fees and litigation costs.  Black bases her request on her alleged need for financial assistance and Hennig's financial ability to assist her with those fees and costs.[20]  Black maintains that she is in need of financial assistance because she does not have the ability to pay attorney fees and based upon Hennig's Financial Declaration he has the ability to assist her.  In support of her statement regarding her inability to pay, Black maintains that at the time of trial she had incurred approximately $140,702 in attorney fees, causing her to deplete her life savings and borrow over $30,000 from her father.

¶36    Black did, indeed, incur significant legal fees.  However, the district court found that Black had the ability to pay those fees based on its review of Black's financial declaration and monthly expenses.  In reviewing Black's financial declaration, the court found that since relocating to Oregon, Black "has limited her employment to three, 8-hour shifts per week" and was "voluntarily underemployed."  The court further found that there was no reason to believe Black could not secure full-time employment and that Black "should be imputed income in an amount equal to what she could secure through full-time employment."  The district court also credited as additional income to Black the child support payments she receives from Hennig.  Regarding Black's expenses, the court found that at least some of the claimed expenses were substantially overstated.  Based on the totality of those findings, the court determined that Black had the ability to pay her own attorney fees without contribution from Hennig.  Black does

---

20. Although this is a custody matter and not a divorce proceeding, Black essentially argues that she is entitled to attorney fees and costs because she meets the factors trial courts are required to consider in awarding or denying attorney fees in a divorce proceeding.  *See Kimball v. Kimball*, 2009 UT App 233, ¶ 45, 217 P.3d 733 ("[I]n divorce proceedings, . . . the trial court's award or denial of attorney fees must be based on evidence of the financial need of the receiving spouse, the ability of the other spouse to pay, and the reasonableness of the requested fees." (internal quotation marks omitted)).

not challenge the propriety of any of the findings demonstrating her ability to pay, but instead focuses only on the amount of fees incurred and Hennig's ability to pay. Because Black fails to assert any error with the court's findings in support of her ability to pay her own attorney fees and litigation costs, we observe no error with the court's decision and conclude that the district court did not exceed its permitted range of discretion. *See generally Heber City Corp. v. Simpson*, 942 P.2d 307, 312 (Utah 1997) (stating that when a party fails to challenge the accuracy of a trial court's findings the appellate court assumes that the record supports the findings and reviews the lower court's conclusions of law and application of that law in the case).

¶37    Black next argues that the district court erred by ordering Black to pay Hennig $7,000 in attorney fees related to the action in Oregon. Black argues that the court erred in finding that Black had filed the Oregon custody proceeding in bad faith. We review findings of bad faith for abuse of discretion. *See Jeschke v. Willis*, 811 P.2d 202, 204 (Utah Ct. App. 1991). "[A] finding of bad faith turns on a factual determination of a party's subjective intent." *Still Standing Stable, LLC v. Allen*, 2005 UT 46, ¶ 9, 122 P.3d 556 (alteration in original) (internal quotation marks omitted).

¶38    In this case, the district court did not state a clear basis for its finding of bad faith. The court entered the following findings regarding bad faith:

> Although [Black] had initiated this paternity action in October 2005 and the matter was progressing in this Court, [Black] filed a Petition to Establish Paternity and a Motion for Judicial Determination of Jurisdiction in the Circuit Court, Clackamas County, State of Oregon . . . in July 2006. In August 2006, the Oregon Court determined that Utah continued to maintain jurisdiction over the case, but not before [Hennig] was forced to incur almost $7,000 in attorneys fees to defend in that forum. At the time she filed in Oregon [Black] knew that jurisdiction over this case was already vested in this Court. The Court finds that [Black's] filing was done without justification and as a forum-shopping measure. As such, it was brought in bad faith.

However, the court's determination that jurisdiction over this case was already vested in Utah at the time of Black's Oregon filing, does not alone, demonstrate that Black

acted in bad faith. The court made no findings that Oregon did not have concurrent jurisdiction over the case at that time. Nor did the court make any findings about Black's personal knowledge pertaining to the jurisdiction issue and whether Black filed the custody petition knowing that Oregon did not have jurisdiction over the matter or whether it may be legitimate to seek to remove litigation closer to home or whether it was solely an effort to drive up costs. As a result, the district court's findings are insufficient to allow a meaningful review of the court's bad faith finding. We therefore reverse the court's bad faith finding and remand for the entry of further findings consistent with this opinion.[21]

B. Attorney Fees on Appeal

¶39     Both Black and Hennig each request attorney fees on appeal, arguing entitlement to attorney fees as a prevailing party. "Generally, when the trial court awards [or should have awarded] fees in a domestic action to the party who then substantially prevails on appeal, fees will also be awarded to that party on appeal." *Davis v. Davis*, 2011 UT App 311, ¶ 23, 263 P.3d 520 (alteration in original) (internal quotation marks omitted). Regarding Black's request for attorney fees, the district court declined to award her attorney fees below. Although we have remanded the district court's order for Black to pay Hennig $7,000 in expenses related to the Oregon action, Black has not substantially prevailed on appeal and was not awarded attorney fees below. As a result, Black is not entitled to an award of attorney fees incurred on appeal.

¶40     Regarding Hennig's request for attorney fees, the district court also declined to award him attorney fees below with the exception of a partial award of attorney fees related to Hennig's expenses to defend himself in the Oregon action. Although Hennig prevailed on the main domestic issues on appeal, he was only awarded attorney fees below on a single narrow issue, which we have remanded. Thus, Hennig is also not entitled to an award of attorney fees incurred on appeal.

---

21. Black also argues that the amount of attorney fees the district court awarded had no legal basis under Utah law. Because we remand the court's bad faith finding, we need not consider this argument. If the district court, on remand, finds that Black acted in bad faith, the court must make findings of fact regarding the reasonableness of those specific fees.

CONCLUSION

¶41    Black first argues that the district court erred by failing to admit evidence pertaining to the relationship between Dr. Hale and Hennig's attorney. The evidence regarding the friendship between Dr. Hale and Hennig's attorney was offered as evidence of Dr. Hale's bias or a motive to testify differently than would otherwise be the case. Rule 608(c) allows admission to show bias, prejudice, or any motive to misrepresent and, as such, the Facebook screenshot evidence should have been admitted. Nonetheless, the record does not contain a copy of the Facebook screenshots offered into evidence nor proffer of its content. The lack of an adequate record prevents us from undertaking a meaningful harmless error analysis and as such no appellate relief is available to Black on this issue.

¶42    Black argues that the district court erred by denying her motion to strike Dr. Hale's testimony because Dr. Hale's methodology was flawed and that she had engaged in improper conduct that violated the AFCC model standards and compromised her professional integrity and recommendations to the court. The district court determined that Dr. Hale's methodology in producing her custody evaluation report was not flawed and that Dr. Hale did not violate professional standards or guidelines. Black does not challenge the court's findings made in support of its decision to deny Black's motion to strike. The district court's findings are sufficient to support its discretion to admit the expert testimony. Thus, we conclude that the district court did not err in declining to strike Dr. Hale's report and testimony.

¶43    Black argues that the district court failed to give proper weight to Black's primary caregiver status when it declined to maintain the temporary custody arrangement and instead awarded joint legal and joint physical custody to the parties. The court's order and trial transcripts reflect the serious consideration the court gave to both the previous custodial arrangement and the stability of the children. Based on the district court's consideration of sufficient supporting evidence and the thoroughly written findings of fact, we conclude that the court was acting within the proper boundaries of its broad discretion in awarding joint legal and joint physical custody to the parties. As a result, we observe no error in the district court's determination that the best interests of the children would be served by awarding joint custody to the parties to ensure that the children would have a relationship with both parents.

¶44 Black argues that the district court erred by ordering that the children's surname be changed to Black-Hennig and by failing to explain the necessity of the decision. However, Black failed to preserve this issue at trial and argues neither plain error nor exceptional circumstances on appeal. As a result, we do not address this issue.

¶45 Black argues that the district court erred in failing to award her attorney fees and costs. Black failed to assert any error with the court's findings in support of her ability to pay based on the amount of income imputed to Black, the inclusion of child support payments from Hennig, and a reduction in claimed expenses. Because Black fails to assert any error with those findings, we see no error in the court's decision and conclude that the district court did not exceed its permitted range of discretion. Black also argues that the district court erred in finding that Black had filed the Oregon custody proceeding in bad faith and as such the court should not have ordered her to pay Hennig $7,000 in expenses related to the Oregon action. The district court did not indicate a sufficient basis for its finding of bad faith. Thus, we reverse and remand the issue for further findings consistent with the directives in this opinion.

¶46 Both parties seek attorney fees on appeal. The district court did not award attorney fees to Black below. The court awarded Hennig only the fees incurred to defend himself in the Oregon action. We have reversed that award pending further findings. Since neither party was awarded fees below, successfully defended on appeal, we therefore deny the parties' request for attorney fees on appeal. The district court decision is affirmed except as to the award of attorney fees as described.

_____
William A. Thorne Jr., Judge

-----

¶47 WE CONCUR:

_____
Gregory K. Orme, Judge

_____
James Z. Davis, Judge

20100597-CA                    25